UNITED STATES, Appellee

v.

FRED WALTERS, Lieutenant Colonel, U. S. Army, Appellant

4 USCMA 617, 16 CMR 191

620

622

Thomas H. King, Esq., and Richard L. Merrick, Esq., for Appellant.

Lt Col William R. Ward, U. S. Army, and 1st Lt Roderick V. Brown, U. S. Army, for Appellee.

## Opinion of the Court

Paul W. Brosman, Judge:

The trial of the accused officer by a general court-martial convened at Heidelberg, Germany, seems chiefly to have been the product of excessive zeal on his part in the development of fraternal and other relations with German Nationals. In any event, there was specified under one charge the existence of a conspiracy with a German contractor to defraud the West German Republic of certain champagne tax receipts, in violation of Article of War 96, 10 USC § 1568. Two specifications alleged violations of Army Regulations 600–100 through an acceptance of gifts from Germans with whom the accused was required to negotiate in the course of his duties as Chief of the Construction Branch, Office of the Post Engineer, at Heidelberg — and these offenses were cast under the Uniform Code of Military Justice, Article 92, 50 USC § 686. Under Article 107 of the Code, 50 USC § 701, the accused was also charged with having made a false official statement to the effect that on no occasion had he been at the same time in the company of two named German contractors. Rounding out the charge sheet was a specification alleging that the accused had unlawfully cohabited with a German woman, in violation of Article 133, supra, 50 USC § 727.

Findings of guilty were returned by the court — although exceptions and substitutions were effected in the specification charging unlawful cohabitation. The convening authority approved. However, an Army board of review affirmed only the findings of guilty of (1) conspiracy to defraud the West German Republic, (2) the making of the mentioned false official statement, and (3) a single specification alleging the acceptance of automobile tires as gifts, in violation of Army Regulations. We granted the petition for review for the purpose of determining whether the accused had been prejudiced by cumulative error, or by unauthorized conferences between the law officer and certain court members — and whether an erroneous instruction had been supplied by the law officer concerning the maximum sentence imposable by the court-martial.

II

The occurrence of the unauthorized conferences now complained of was not revealed in the record of trial originally prepared by the reporter. Instead the existence of such gatherings was disclosed only through certificates executed by various participants in the proceedings. It appears that these documents were obtained at the direction of the convening authority, following complaints by Mr. Lorber, the accused's civilian counsel, and were attached to the record of trial. Their import was considered in the staff judge advocate's review of the case, and presumably by the convening authority in his evaluation of the record.

The first certificate, dated March 12, 1953, comes from Mr. Lorber. It recites that on January 20, during the first session of the trial, the law officer, during a recess, retired with the members of the court to a room allocated to the use of the latter. Defense counsel complained to the law officer of this practice at the time, but the latter responded to the effect that there was nothing in the law which prevented him from relaxing in the anteroom with court members. Thereafter, on January 21, 1953, during another recess, and

**623**

while court members were present in their private quarters, the law officer indicated to defense and trial counsel that he desired to discuss with the court its preference as to times of attendance and adjournment. Trial counsel asked defense counsel if he wished the accused to be present, but Mr. Lorber indicated that this was unnecessary — provided there was involved no more than a matter of fixing hours of attendance. Trial counsel, defense counsel, and the law officer entered the chamber and discussed this specific matter — but thereafter, according to Lorber, there ensued a discussion "of law and facts," in which the law officer and members of the court participated. Defense counsel thereupon observed to trial counsel that the discussion was out of order; the latter agreed but added that "it was not his idea." The president of the court then raised the possibility of calling additional witnesses. Thereafter a member of the court inquired of the law officer concerning what, if any, German laws in existence under the Nazi regime had been repealed. The member's question related directly to the tax laws which the accused had allegedly conspired to evade, for — as the court had by then learned — these excises had been promulgated by the Hitler government as war economy measures in 1939 and 1941. At this time the law officer addressed defense counsel and observed that the latter's knowledge of local law, obtained from practice in Germany, would enable him to answer the question. Defense counsel declined to express an opinion — whereupon the law officer stated that in his view all Nazi provisions, not specifically repealed by the Allies, remained in full force and effect. The trial counsel suggested the desirability of a departure from the room — and he, Lorber, and the law officer left together.

A second certificate, dated March 4, 1953, was executed by the law officer who confirmed that, on January 20, 1953, and at no other time, he retired with the members of the court to an anteroom adjacent to the courtroom. He stated further that at such time he did not discuss the evidence with the court, nor advise its members as to any pertinent law. The law officer also asserted generally that at no time "except as permitted by law, did I advise or discuss with the court or any member thereof the case then in hearing."

A third certificate, dated March 7, 1953, was signed by the court's president, who stated that the law officer had retired with court members during only one recess in the course of the trial— that taking place on January 20. He added that no conversation held at that time had to do with the case of the present accused.

An undated certificate from Major Krieger, the trial counsel, related to the episode of January 21, and confirmed that the law officer, the defense counsel, and himself had entered an antechamber near the courtroom in order to discuss with members of the court the desired hours of sessions of the tribunal. Following this discussion, the president of the court asked for the presentation of certain further evidence. Thereafter a member indicated that the court was not clear as to applicable German law governing the champagne tax. At this time "the Civilian Defense Counsel stated that the proceedings which were then taking place were deemed by him to be irregular and improper for the reason that counsel and the Law Officer had entered into this discussion with the court for the sole purpose of discussing adjournment and the time for convening the court." Major Krieger made clear to Mr. Lorber "that I was in agreement with him and that this discussion was not my idea." However, the discussion of German laws continued, and the law officer was asked which of these statutory provisions remained in effect—with particular reference to the laws enacted during the Hitler regime relating to the champagne tax. "The Law Officer then stated to the Civilian Defense Counsel that since he was a practicing attorney in Germany, he should know the answer to the member's question. The Civilian Defense Counsel replied that he did not feel under the circumstances that he was in any position to decide questions of law. Thereupon the Law Officer stated that in his opinion all of the German laws which were not specifically repealed remained

in effect." At this point trial counsel suggested a departure—and, while defense counsel accompanied the former back to the counsel table, Mr. Lorber asserted that he regarded the preceding occurrence as highly objectionable. As will be observed, there is no significant discord between the reports of trial and defense counsel concerning the events of January 21.

### III

Appellate Government counsel have argued that this Court is precluded from any sort of consideration of these certificates, for the reason that—in the Government's view—they constitute no part of the "record of trial." Cf. United States v. Harvey, 2 USCMA 609, 10 CMR 107; United States v. Burns, 2 USCMA 400, 9 CMR 30. They insist that the circumstances recounted in the certificates may only be examined when submitted in support of a petition for a new trial, in conformity to the provisions of Article 73 of the Uniform Code, 50 USC § 660. Government counsel add that this Court must not permit appellate review to deteriorate into a "battle of affidavits."

In weighing the validity of the Government's contention, we advert first to the requirement of Article 39, supra, 50 USC § 614, to the effect that—save for the deliberations and voting of the court-martial's members—all proceedings of a general court "shall be made a part of the record." The purpose of the mentioned Code provisions is—we are certain—to assure a complete review of the events transpiring at the trial. Conscious of this purpose, we have demonstrated marked unwillingness to permit deviations from the standard prescribed by Article 39. See United States v. Whitman, 3 USCMA 179, 11 CMR 179. Indeed, we have indicated clearly that when the purported record of trial omits a portion of the "proceedings" of the court-martial, then reversal follows—unless it is clear beyond peradventure that the omissions were inconsequential, and related only to items which in no wise could have affected the result. See United States v. Nelson, 3 USCMA 482, 13 CMR 38.

In some instances the failure of the reporter to incorporate a portion of the proceedings in the record of trial may be obvious from a reading of that document alone. United States v. Cadena, 1 USCMA 534, 4 CMR 126. In others a more careful examination of the record, as prepared by the reporter and authenticated by proper persons, may be required to determine whether gaps exist therein. Cf. United States v. Kupfer, 3 USCMA 478, 13 CMR 34. Still other cases are conceivable in which—although omissions may have occurred—there is no internal evidence thereof in the record as prepared initially.

In this last type of situation, how then may omissions be brought to light? Appellate Government counsel speak of a petition for new trial. Yet it is hard to see how proof of lacunae in a record can be said to fall within the category of newly-discovered evidence under Article 73—or even in most cases within the ambit of what is deemed a "fraud on the court."[1] In any ▪ event, the petitioner for a new trial bears the burden of establishing that such a proceeding would as to him probably produce a substantially more favorable result. United States v. Thomas, 3 USCMA 161, 11 CMR 161.[2] This onus seems somewhat heavier than that which reposes on an appellant in the normal course of appellate review, and would doubtless lead an

---

[1] If the omission from a record of trial involves deliberate suppression by ▪ parties charged with the preparation of the record, there would, of course, be "fraud on the court." United States v. Ingalls, 13 CMR 580. If, however, the omission was inadvertent or proceeded from a misapprehension of some sort, "the fraud" would be lacking.

[2] The petition for new trial under Article 73 is not acted on by the convening authority, as in the original record of trial, but instead goes to The Judge Advocate General. If the accused's case is, at the time of the petition, pending before a board of review or this Court, the petition is transmitted to the board or Court respectively for action. Otherwise, it is disposed of by The Judge Advocate General.

accused to utilize a different procedure, if available.

Clearly another procedure *is* available —for the current Manual for Courts-Martial provides that a certificate of correction may be secured when, during the course of review, a record of trial is "found to be incomplete or defective in some material respect." Paragraph 86*c*. The alleged gaps in the instant record were not dealt with through the preparation of such a certificate in the manner provided by the Manual. However, this deviation from the form of the usual certificate of correction does not appear to have been attributable either to the accused or his counsel. Moreover, it appears to have been effected with the full consent of the convening authority, who is charged by the Manual with the duty of securing corrections to the record of trial. Paragraphs 86*c*, 86*d*, 95. And the marked similarity of the contents of the certificates submitted by the defense counsel, acting for the accused, and by the trial counsel, who represented the Government at the hearing, and who is charged with the preparation of the record of trial under the direction of the court—Manual paragraph 82*a*—serves to analogize the situation to one of amending the record with the consent of the parties. See 3 Am Jur, Appeal and Error § 688.

Congress certainly intended that the proceedings of a general court-martial be fully reviewed—both by military agencies and thereafter, in appropriate cases, by this civilian Court. The importance of this requirement is so great —so highly compelling—that, in a case like the one at bar, we are sure that liberality is demanded in the examination of claims that lacunae exist in the record—omissions which might serve to deprive an accused of the full and complete review directed by Congress. Of course, we do not recede from the position that a certificate of correction, authenticated in keeping with the Manual's requirements, will be regarded as conclusive, in the absence of a claim of fraud. United States v. Galloway, 2

**626**

USCMA 433, 9 CMR 63. However, we have here no problem of a clash between a properly authenticated certificate of correction relied on by the Government, on the one hand, and affidavits submitted by the defense on the other. Contrariwise, it seems conceded that certain events occurred, and the only issue is whether those events may properly be considered by this Court.

We doubt that we shall be met in the future with frequent "battles of affidavits" by reason of this decision to consider omissions from a record of trial, although raised in a manner other than by certificate of correction. In the first place, we anticipate that omissions from records—as reported and authenticated by proper functionaries—will prove to be as rare in the future as they have been in the past. In addition, we do not foresee that charges that certain "proceedings" of a court-martial were not included in the record as authenticated will be bandied about loosely. In this connection, we may observe that we would not regard it as inappropriate were a convening authority to require that a complainant verify allegations concerning oversights in a purportedly complete record of trial. Moreover, the convening authority could well provide a hearing in the matter if he chose. False statements concerning the record of trial might then constitute a ground for the imposition of severe disciplinary sanctions—even against an offending civilian attorney.

Generally, of course, a party complaining of omissions in a record of trial should be urged to seek a certificate of correction— and an inability to obtain such a document would bear on the weight to be attached to the complaint. Further, we have no intention of permitting the accused or his counsel to delay indefinitely in presenting a challenge to completeness of the record. Fairbanks, Morse & Co. v. American Valve & Meter Co. 276 US 305, 72 L ed 584, 48 S Ct 317; 3 Am Jur, Appeal and Error § 687; cf. United States v. Thomas, supra; United States v. Borner, 3 USCMA 313, 12 CMR 69. If such a contention is raised promptly—as will certainly be required—false allegations can

ordinarily be refuted, and true complaints can usually be verified. It is obvious that, in such instances, substantial weight must and will be given to determinations by the convening authority and his staff judge advocate concerning the existence or nonexistence of "proceedings" unreported in the record of trial.

We believe, therefore, that the intake of affidavits on the appellate level can be kept within reasonable limits—although we again reaffirm our determination to accomplish our review on the basis of *all* of the "proceedings" which in fact transpired at the trial. Certainly in the present case it is difficult to detect the dangers the Government insists are latent in any consideration we may accord the certificates allegedly reflecting trial events not included within the authenticated record. The complaint of unreported transactions was made by defense counsel with reasonable promptness—and at a time when his allegations might have been refuted, if untrue.[3] Instead of meeting denial, they were fully corroborated by the affidavit of the trial counsel—with the result that no material conflict exists among the certificates attached to the record. No sort of intimation appears in the review of the staff judge advocate, or elsewhere, that it was ever suggested to the civilian defense counsel that he should present in some other form—as through a formal certificate of correction—the items omitted from the record. The staff judge advocate himself specifically considered the substance of the matters recited in the certificates, and in no way sought to impugn the credibility of the mutually corroborative accounts of the trial counsel and the civilian lawyer who represented the accused.

However, the conclusion that we must treat the matters related in the personal certificates as if they had been reported in a formal certificate of correction does not dispose of the present problem. The nature of these events is such as to raise the question of whether they constituted, in fact, a part of the court's "proceedings," open to review in this tribunal. In this connection, we may distinguish United States v. Harvey, supra, on which the Government places great reliance. There we refused to consider new *evidence* which had been unearthed subsequent to the time of trial, and which was considered initially in the staff judge advocate's review. Obviously that evidence did not relate to "proceedings" of the court-martial, since it first came to light after completion of the trial, and could not conceivably have been considered by the court-martial which made the findings of guilt and imposed the sentence. On the other hand, the incidents with which we are now concerned occurred prior to the rendition of findings and—at least so far as chronology is concerned—distinctly were not excluded from effect on them.

The episodes presented in the certificates all occurred during recesses or adjournments of the court-martial which tried the accused—and quite clearly were outside the knowledge of the court reporter. If Congressional intent in requiring a full review of the record is to be accorded any sort of meaning, we cannot condone the defeat of that purpose through permitting a court to receive evidence or instructions "off the record" during a period of nominal recess or adjournment. If, unhappily, the court-martial or some of its members, either intentionally or through inadvertence, are permitted to hear testimony, or to obtain legal advice, during

---

[3] In connection with promptness some additional explanation seems in order. Although the trial concluded on January 29, 1953, it seems that the record of trial, by reason of its length and complexity, was not completed until March. The Chronology Sheet indicates that the record of trial was not received until March 6, 1953, by the convening authority. The accused's receipt for the record of trial is dated March 10, 1953. The earliest of the dated certificates was executed on March 4, 1953. Accordingly, it is clear that Mr. Lorber did not delay after completion of the record of trial by the reporter in bringing to the convening authority's attention that certain events not reported therein should be considered.

a purported recess, such matters must be deemed part of its "proceedings" and should be reported in the record of trial. In sum, we interpret the "proceedings" of such a body to include any sort of conference at which the court-martial carries on its business of obtaining the facts and the law applicable to the evidence before it—this although such a conference does not purport to constitute a part of the formal functioning of the tribunal. The incidents recited in the certificates here in question we believe to fall within the category of "proceedings."

The Government argues that transactions occurring during recesses or adjournments must be raised in open court as soon as they reach the attention of defense counsel—and that, if action of this character be not taken, the accused may not later challenge the propriety of such events. This viewpoint may indeed be reconciled—along lines of waiver—with our premise that episodes transpiring during a recess or adjournment may constitute a part of the court's "proceedings." And this reconciliation would suggest that, as a normal thing, matters occurring outside the courtroom are not reported in the record of trial—and that defense counsel is chargeable with knowledge of this circumstance. Therefore, unless he challenges in open court the fact that the court-martial took action, or received information, during a recess, defense counsel must be deemed to have waived his right to appellate review of events taking place during the course of a recess—provided he had knowledge thereof prior to the rendition of findings. We may note that such a view comports with judicial reluctance in the civilian scene to consider after verdict claims that a jury was tampered with—when the facts underlying those claims were known to the complaining party prior to the rendition of the verdict. Cf. Ryan v. United States, 191 F2d 779 (CA DC Cir) ; Miller v. State, — Ind —, 115 NE2d 120.

We have no hesitancy in accepting the view that—if he has knowledge thereof —a defense counsel must come forth promptly, and prior to findings, with any contention that the court-martial has transacted some of its "business" outside the normal course of its functioning, and without the presence of all of its members, trial and defense counsel, the accused, the reporter, or some one or more of them. Certainly we do not propose to permit defense counsel to remain silent and to speculate cunningly as to a court's findings, if he has knowledge of facts suggesting that the court engaged in "proceedings" during a purported recess or adjournment. United States v. Thomas, supra.

However, the case at bar does not fall within the scope of this principle. The undisputed certificates reveal that Mr. Lorber, the accused's civilian counsel, appropriately brought to the attention of both trial counsel and law officer his dissatisfaction with the incidents which occurred during the recesses. This action suffices to destroy any contention that he slyly omitted to bring out known irregularities at a time when their effect might have been corrected with ease. In our view, once defense counsel had called to the attention of his Government counterpart and of the law officer —the latter being the military analogue of the civilian judge—the fact that court "proceedings" had been conducted outside usual channels, he had satisfied all conditions precedent to obtaining appellate review of those "proceedings." At that point, the burden shifted to trial counsel and the law officer to take corrective action in open court, or to suffer the risk that reviewing authorities might find prejudicial error when—by whatever means—those "proceedings" were revealed.

It is to be observed that in the instant case it is distinctly arguable that defense counsel labored under no duty to do even as much as he did by way of complaint. Indeed, the law officer seems to have been the principal proponent in the conduct of court "proceedings" during purported recesses, and thus would appear to be chargeable with the responsibility for taking necessary action in open court to correct any prejudice which may have flowed from these irregular "proceedings." In any event, he certainly bore this onus once defense counsel specifically complained to him of

the irregularity. Accordingly, we attach no final significance to the fact that civilian defense counsel failed to raise in open court the circumstance that the court-martial had conducted "proceedings" during periods of apparent recess.

## IV

A further document has been presented to us relating to the complaint that unauthorized conferences ▪ took place between court members and trial personnel. This takes the form of an affidavit executed by the law officer in the instant case on January 12, 1954, and attached to the Government's brief in this Court. The considerable delay which marks the appearance of this affidavit would in any setting lead to unwillingness to accord weight to it. Especially is this true where, as here, defense counsel would experience much difficulty at this date in securing rebutting affidavits from other persons who observed the events described by the affiant. Further, the Manual envisages that as a normal thing corrections of a record of trial will be accomplished under the aegis of the convening authority, rather than in higher echelons of appellate review. Paragraph 95, 86c, 86d. To be considered by us, this affidavit should have been submitted to the convening authority at the time the completeness of the record of trial first came into question. However, since the statement by the law officer has no tendency to alter our conclusions concerning the appropriate result, and because it does serve to demonstrate that the Government does not dispute in general the occurrence of the episodes complained of by the defense, we shall, in the interest of completeness, set forth its substance hereafter.

This affidavit reiterates that on January 20, 1953, during a recess the law officer retired to a private room occupied at the time by court members. The affiant insists that no discussion of the case took place on that occasion, but concedes that Major Krieger—the trial counsel—called him from the room to inform him that Mr. Lorber had complained that the law officer was closeted with court members during the recess.

Thenceforth, the law officer avoided court members during periods of adjournment, although—according to this affidavit—he informed Lorber that he knew of no rule demanding that he do so.

Concerning the events of January 21, 1953, the law officer admits the discussion of court session hours, which was followed by the request of the court's president to hear further evidence on certain points. According to the law officer, no complaint was voiced at the time either by trial or defense counsel. The law officer confirmed counsels' statements to the effect that a question had been asked by a court member concerning the applicability of certain German legislation and that he, the law officer, had directed the question to Mr. Lorber. According to the affidavit, "Mr. Lorber retorted that his function did not include advice to the court on matters of law."

## V

From the welter of documents before us here a few basic conclusions may be drawn. One is that the law officer demonstrat- ed unawareness of his overriding, if tacitly expressed, duty to avoid, as much as possible, fraternization with court members and trial personnel during the course of the hearing. Even during the formal proceedings he displayed this blind spot. For instance, hardly had the trial opened when defense counsel objected to a discussion held out of his presence between the law officer and the trial counsel. The latter thereupon announced that the conversation related only to the desirability of clearing prospective witnesses from the courtroom—to which explanation the law officer added: "The whole matter is insignificant and not worthy of any more comment. There is no rule that I know of that precludes the prosecution's discussing something with the law officer out of the presence of the defense counsel."

This comment—and a similar one related in his own second affidavit—reveal some of the present law officer's fundamental misconceptions. Canons of Professional Ethics of the American Bar Association, Canon 3, 1949; Orfield,

**629**

Criminal Procedure from Arrest to Appeal, Chapter 7, paragraph 51. In addition to the specific prohibitions, and other regulations, set forth in the Manual for Courts-Martial and in the Uniform Code, there exist certain basic principles which underlie the conduct of trials by court-martial—or any other sort of tribunal. Not the least of these is that the court's actions and deliberations must not only be untainted, but must also avoid the very appearance of impurity. Cf. United States v. Johnson, 318 US 189, 87 L ed 704, 63 S Ct 549; United States v. Atkinson, 297 US 157, 80 L ed 555, 56 S Ct 391; Ryan v. United States, supra. When such an unhappy appearance is present, proper judicial administration often requires reversive action.

We need not—and do not—question the motives of the law officer who functioned at the trial of the case before us. The point is that he sadly neglected appearances. The Uniform Code purports to set the law officer apart from court members—much as a judge is set apart from the jury. Admittedly, this segregation is difficult to maintain at times in the military milieu, since law officer, court members, and trial personnel may be thrown together—occasionally but necessarily—in the performance of essential military duties quite unrelated to the trial of the case. This Court—one may be sure—is fully aware of these necessities. Cf. United States v. Adamiak, 4 USCMA 412, 15 CMR 412. Yet we do not feel required to sanction close camaraderie between trial personnel and members of the court when nothing in their military duties demands the development of such a relationship during trial. Although there be no express rule in the Manual—or elsewhere in the traditional sources of military law—dealing with conduct during a recess, a law officer must exercise sound discretion in the avoidance of behavior at such times inconsistent with the proper and dignified operation of courts-martial, or with general confidence in their integrity. Accordingly, we consider that, in the instant case, the law officer's behavior during the two recesses constituted error.

We may observe also that the law officer similarly appeared, during some of the open sessions of the court-martial, sharply to reveal his impatience with, and disapproval of, the accused's civilian attorney. For example, late in the course of the lengthy trial, and as the defense drew near the end of its case, Mr. Lorber intimated that he might wish to present certain evidence "after the supper hour." The law officer testily informed him that he was "presumptious [sic] in presuming that we are going to eat." Still later the latter pointed out to court members that "it might not be a bad idea" if the defense counsel were to return to law school. In retrospect this comment seems peculiarly inappropriate, since Mr. Lorber himself called to the law officer's attention the irregular nature of the latter's actions during the recesses, and because the board of review's disaffirmance of one finding of guilty resulted from the law officer's persistence in receiving evidence which defense counsel had clearly and soundly branded as inadmissible.

It cannot be denied that the law officer was engaged in the trial of a difficult case. Not only were German witnesses the source of the prosecution's case under most of the charges—with attendant linguistic difficulties—but one of the charges specifically depended on an invocation of West German statutes. Moreover, these Government witnesses for the most part were friends of the accused, and were in some instances linked to him by self-interest—for they were faced with possible prosecution, either by American or German authorities, if certain of the accusations against Colonel Walters were substantiated. Such difficulties did not, however, justify the law officer's involvement in a contest of personalities with defense counsel. A law officer must not forget that sound principles of judicial administration demand that he avoid undue controversy with other participants in the trial, and the Manual states that "he should not depart from the role of an impartial judge, or assume the role of a partisan advocate." Paragraphs 38b(2), 73c(1). Also, he should foresee that excessive participation in controversies with counsel will inescap-

ably give rise to claims of bias, to challenges for cause, or to contentions that his interference with counsel hindered their representation of the accused.[4]

A second conclusion which may be predicated on the documents under scrutiny is that the law officer placed Mr. Lorber, the defense counsel, in an extremely difficult position by requesting of him—in the presence of court members—an expert opinion on German law. A defense counsel is under no obligation to submit proposed instructions on the law—although he may be requested by the law officer to do so. Manual for Courts-Martial, paragraph 73c(2). Of course, this provision relates to "proposed additional instructions," and thus envisages that the law officer shall first have furnished advice and direction in some degree. In the case at bar, this was not at all the situation—for defense counsel was asked to shoulder the law officer's responsibility for the initial formulation of a charge concerning relevant German law. At any rate—as we interpret the Manual—the "request" referred to therein must not go beyond the point of an offered opportunity. No pressure may be exerted—either tangible or the reverse—to extract proposed instructions or opinions of law from counsel.

The law officer here—it seems to us—placed the defense counsel in an unwarranted dilemma by means of the manner and locale in which he directed his inquiry to Mr. Lorber. As one choice, the latter could, of course, have yielded to pressure from the law officer and ventured an opinion. Or he could have disavowed possessing expertise in German

law, and professed ignorance of the matter raised by court members and the law officer. This latter course of action would certainly injure any possible plan he may have had to contend subsequently that a violation of German law had not been shown by the evidence. A third alternative open to defense counsel—the one he in fact utilized—was to refuse to answer the inquiry. This alternative presented the risk—familiar to any trial lawyer of experience—of an inference by court members that the attorney declined to reply for the reason that the true answer would prejudice his projected arguments. To some extent Mr. Lorber seems to have turned aside this inference by bringing home to those present that he did not consider that a response by him to the German legal question would square with orderly court-martial procedure. Yet—despite this adroitness—some court members, and for that matter the law officer, may have inferred that the distaste to comment on German law stemmed from a belief that its provisions were unfavorable to the interests of his client. We are sure that the subjection of the defense to the possibility of this adverse inference tainted the incident of January 21 with more serious error. Further, it was error to force the defense lawyer to a position where he was compelled to criticize the law officer before the members of the court for a blunder of the most elemental character.

Thirdly, we must emphasize that Congress intended that an accused be present during all of the "proceedings" of a court-martial—save for its deliberations on findings and sentence. To a limited extent, of course, this presence

---

[4] We do not feel that imposing an obligation on law officers to refrain from bickering with counsel will impair the law officer's control of the court-martial proceedings. A law officer can be firm without using invective — however much counsel might in another locale be a fit subject for such invective. We, of course, adhere to our determination to support the law officer to the hilt in instances where firmness in dealing with counsel is required; and in this context we reiterate that as to "flagrantly contemptuous conduct, law officers should

not hesitate to employ the power granted by Article 48, Uniform Code of Military Justice, 50 USC § 623, especially when counsel has been warned against such action." United States v. DeAngelis, 3 USCMA 298, 12 CMR 54. It might often be desirable to give preliminary warnings out of the hearing of the court members, although ultimately under the present procedure they must vote on any finding of contempt. See Manual for Courts-Martial, United States, 1951, paragraph 118, Appendix 8b.

may be the subject of waiver. For example, we find no basis for objection to the first phase of the recess consultation on January 21, during which trial counsel, defense counsel, the law officer, and court members discussed the hours of the court's future sessions. No error derives from the accused's absence at this time pursuant to a conscious choice on the part of his counsel—and especially with the latter present to represent him and protect his interests.

This election related, however, only to the topic which had been proposed for discussion—that is, the hours of subsequent sessions. When the consultation spilled over into other topics, the accused should have been apprised of the expanded agenda and invited to be present—or the conference should have been terminated forthwith. The Government has contended that, when the discussion of January 21 departed its anticipated bounds, a responsibility rested on defense counsel to fetch the accused—and that his failure to do so precludes the present comment concerning the latter's absence from the conference. If recesses are to be used for the transaction of a court-martial's "business"—a practice whose growth we are quite without disposition to encourage—the Government should, at the very least, secure the accused's consent to the procedure employed. Its personnel must either assure his appearance, or make certain that he has consciously and knowingly relinquished the right to be present. Obviously, he could not have done this latter when, as in the case at bar, he was informed that item A would be discussed—but, in addition, items B and C were dealt with. It is undeniable here that neither the accused nor his counsel consented to the discussion of B and C out of the former's presence.

The error would certainly have been diminished in impact had the law officer at the time requested leave of defense counsel to treat of other matters not envisaged when the conference was proposed. Similarly, too, the error would have been minimized had the law officer later referred to the incident in open court—with the result that the accused would have been informed openly and directly of what had transpired out of his hearing. The law officer's failure to take these steps is the less open to condonation for the reason that the remark of defense counsel—referred to in the law officer's affidavit as a "retort"—should have put the latter on notice that the incident had not met with defense approval.

VI

It has been urged that, in view of the accused's absence during the recess conference, a rehearing is required as to *all* affirmed findings of guilt. In this connection our attention has been directed to cases involving the so-called "closed conference," in which we have been willing to reverse on a showing that the law officer had conferred improperly with the court during its deliberations on findings or sentence. United States v. Keith, 1 USCMA 493, 4 CMR 85; United States v. McConnell, 1 USCMA 508, 4 CMR 100.

The events of January 20 will be considered at the outset. It will be noted that neither the accused nor his counsel was present when—during a recess—the law officer retired to a room tenanted by court members. However, unlike the "closed conference" situation, it is clear that the court was not at the time engaged in the sensitive business of deliberation. Indeed, the trial had scarcely begun. Accordingly, the incident could hardly have given the appearance that the law officer—in contravention of Congressional intent—was seeking to intrude on the determinations of the court.

In the second place, there was no doubt in the "closed conference" line that at least some discussion took place concerning the matter the court-martial had before it. Indeed, in those cases it was for the very purpose of entering into such a discussion that the law officer was called into the conference in question—that is, to advise the court, rather than to engage in fraternal intercourse with its members. In the instant case, however, we have unrefuted certificates from both the law officer and the president of the court to the effect that no sort of discussion of the case

632

then in hand took place during the period the law officer was alone with members of the court. It would, of course, be possible to dismiss from consideration these statements by participants, on the ground that the "appearance of evil" is so powerful as to overshadow what occurred in fact. Under all of the circumstances, however, we are sure that, if we were to do this, we would exaggerate the idea of an appearance of evil out of all proportion.

Moreover, we cannot reckon without the administrative aspects of the matter. As we have pointed out elsewhere, it is entirely feasible to enforce the principle that, during the deliberations of the court-martial, the law officer shall not be permitted to engage in "closed conferences" with its members. Normally the law officer can with utmost ease avoid joining the court in closed session—or, if lawfully requested to enter, can refuse to answer questions pertaining to the subject matter of the deliberations. On the other hand, it is frequently impossible to avoid *all* contact with members of the court during periods of recess or adjournment, especially in the instance of a protracted trial. In the course of military duties and otherwise, such persons may often and inescapably be thrown together. We are sure that to reverse a case because of such contacts—without more—would be to forsake reality. Accordingly, we prefer to adhere to the view that any presumption of prejudice arising from such contacts may be overcome when a clear showing is made that no subject of discussion could possibly bear on the court's determination of a case before it. Cf. United States v. Adamiak, supra.

We cannot fail to observe that no point was made in open court of the recess incident of January 20, despite Mr. Lorber's contemporaneous knowledge of its occurrence. While we have previously emphasized that Mr. Lorber waived no right of the accused by failing during the regular sessions of the court to refer to these occurrences, we are inclined to think that—if he had believed the fundamental fairness of the court-martial to have been impaired

thereby—he would have interposed a challenge for cause when the hearing was resumed. Thus, our conclusion is that, although the law officer committed error when he consorted with court members during a declared recess, no prejudice stems from this irregularity. At most, the misstep becomes an item for consideration in assessing the defense's claim of cumulative error.

It is worth noting too that, at the time of the incident of January 20, the only significant part of the prosecution's case which had been heard related to the charge of conspiracy to defraud the West German Republic. Accordingly, it is the more difficult to conclude that—under any theory—the error could have had impact on the court's consideration of the remaining offenses. After all, it is unlikely either that the law officer would have commented, or that his remarks—if made—would have received weight, as to the charges on which the court had not then heard evidence.

The incident which took place during the January 21 recess too is initially distinguishable from the "closed conference" line of decisions in that—although the accused was not present—his personally selected civilian counsel was. Accordingly, this meeting wholly lacked any suggestion of conspiratorial appearance. After leaving the scheduled topic, the conference first dealt with the court's desire for further evidence. A court-martial is empowered to demand the presentation of additional evidence when unsatisfied with that already heard. Manual for Courts-Martial, paragraph 54*b*. Under normal circumstances, this demand will be made in open court, but we can find no risk of prejudice in its expression during the recess here—for the reason that defense counsel was present at the time. There is certainly no problem of improper communication *with* the court-martial. Instead, the communication moved *from* the members of the court. At most, the request by the court for additional evidence revealed somewhat the mental processes of its members—a revelation which might have a bearing on trial tactics. Yet Mr. Lorber—the accused's

**633**

chosen representative in the conduct of his defense—was present, and we are unable to discern that his client was substantially disadvantaged by any such insight afforded during the consultation.

The second objectionable phase of the January 21 incident centers on the discussion of German tax laws. Here too it is noteworthy that defense counsel was present throughout the colloquy. It can be argued, therefore, that, if misconceptions of law were created, the situation might easily have been rectified at a later time—and prior to findings —through a request for contrary instructions. However, we are inclined to believe that the giving of instructions in open court constitutes so fundamental a part of the Uniform Code's framework that a departure does not become insignificant merely because defense counsel might later be entitled to request a correct charge. See United States v. Lowry, 4 USCMA 448, 16 CMR 22. Yet in the instant case the law officer did cover in his instructions the very area which had been the subject of his earlier advice. In fact, he specifically told the court that "you may presume as a matter of law that the law imposing the tax on champagne and other alcoholic beverages was in full force and effect." This latter charge was given not only in the presence of defense counsel, but also in that of the accused, who—it will be recalled—had been absent during the recess of January 21.

In the "closed conference" cases we have uniformly held that prejudice may be regarded as purged where the law officer—in the presence of the accused, the court, and all trial personnel—relates in complete detail the events occurring during such an illicit gathering. United States v. Ferry, 2 USCMA 326, 8 CMR 126; United States v. Freeman, 2 USCMA 329, 8 CMR 129. These cases may serve to constitute an analogy for a holding that the law officer's subsequent instructions in open court operated to remove whatever prejudice may have resulted from his original error in expressing to the court a legal opinion during the recess.

634

Our difficulty, though, is with the circumstance that the accused's defense was considerably embarrassed during the course of the January 21 incident. The civilian defense counsel is revealed by the record to be an American lawyer who, at the time of trial, was engaged in practice in West Germany with authorization from the Occupying Powers. The charge of conspiracy to defraud the West German Republic involved the applicability of West German law. It is quite possible that Mr. Lorber was retained by the accused—in addition to assigned military counsel—with the expectation that his expertise derived from having practiced law in West Germany would be of special value in defending against the conspiracy charge. Yet—as previously mentioned—the incident of January 21 may well have tended to produce an inference, on the part of both court members and law officer, that Mr. Lorber himself believed that West German law did not favor the accused's position at the trial.

It is well-recognized that a party to litigation will not be allowed to subject his opponent to adverse inferences by reason of the use or assertion of the latter's legal rights. See, e.g., Johnson v. United States, supra; 3 Am Jur, Appeal and Error, § 1061. For this very reason a trial counsel is precluded from commenting on an accused's exercise of the right to remain silent at the hearing. Manual for Courts-Martial, paragraph 72b. In like manner we are sure that the accused should not be compelled to labor under an adverse inference created by the law officer, any more than he would be required to labor under one created by opposing counsel. That the inference stemmed from remarks made by the law officer during the course of an unauthorized conference is obviously an aggravating circumstance. Further, the absence of a reporter to transcribe contemporaneously and verbatim the law officer's statements concerning West German law renders it especially difficult to seek to appraise now the impact on court members' minds of what was said by the latter.

## VII

In considering the effect to be given the law officer's error in requesting a legal opinion from civilian defense counsel under the present circumstances, we must inquire whether the accused was thereby deprived of effective representation during the trial. Careful examination of the record convinces us that this was not at all the case—and no serious contention to this effect has been presented at any time. Sanford v. Robbins, 115 F2d 435 (CA5th Cir), cert denied 312 US 697, 85 L ed 1132, 61 S Ct 737. The error occurred in the course of a discussion of German law relevant to the conspiracy charge and to no other. Also, the possibility that court members might have inferred from Mr. Lorber's refusal to reply that this law was adverse to his case relates only to the conspiracy charge. Therefore, we are sure than whatever prejudice resulted from the incident was restricted to this charge alone.

Whether the incident of January 21 should—in and of itself—be regarded as ground for reversing the conviction of conspiracy we need not decide. In our view, this finding of the court falls well within the ambit of the doctrine of cumulative error—under which a number of errors, no one perhaps sufficient to merit reversal, in combination necessitate the disapproval of a finding. United States v. Yerger, 1 USCMA 288, 3 CMR 22. Directly related to the conspiracy charge, we find not only the discussion of West German law during the recess on January 21 out of the accused's presence, but also the involvement of his counsel in a difficult position with reference to the defense against that charge. In addition there was the episode of January 20, which, as has been indicated, had chiefly to do with the conspiracy charge — the only one as to which the prosecution had presented significant evidence at the time. Further, when the accused assumed the stand to testify as to other charges, a member of the court put a question directed to the conspiracy charge, about which the accused had not volunteered to speak. Although the question was ruled improper — and the accused not required to reply — the fact that it was put must be regarded as offensive under the doctrine of cumulative error. Other irregularities are reflected in the record of trial which it would be profitless to set out in detail.

It is possible, of course, that the various errors outlined earlier herein did not influence the court-martial in its finding of guilt of conspiracy to defraud the Bonn Republic. However, we are little inclined to speculate in this area — in light of the egregious character of the irregularities involved here. It is sufficient to say that — in our view — the evidence supporting this finding was not so overwhelming as to argue convincingly for a different result.

## VIII

Since we are reversing the conviction of conspiracy to defraud the West German Republic, how may we justify affirmance of the approved findings of guilty under the remaining two charges? In the first place it is to be noted that the bulk of errors occurring at the trial bore a close relation to that charge and no direct one to the other two. Cf. United States v. Dorsett, 7 CMR 427. Secondly, in applying the doctrine of cumulative error, we are required to consider the compelling force of the evidence supporting the findings as to which error is claimed. Such a standard is, of course, demanded by Article 59 (a) — the "harmless error" provision of the Uniform Code — for the reason that we have not detected in the present record any single error so fundamental as to necessitate reversal of all findings.

To demonstrate that none of the errors previously related could have operated to prejudice the accused materially, we must, at long last, summarize the evidence having to do with the alleged false official statement and the illegal receipt of gifts from a German businessman. As to the latter offense, the accused himself admitted from the stand that in December 1951 he had received five automobile tires from one Otto Mackensen, a German architect, with whom he was engaged in official

dealings. These tires were used by the accused during the course of a full year without any sort of offer of reimbursement. The accused's explanation was that, because of linguistic difficulties, he had been unable to ascertain the cost of the tires, and that he had been so fully occupied in the performance of his military duties that he could find no time to pay for them.

Irrespective of its possible implication of guilt if taken at face value, it is difficult even to accept the accused's story — insofar as he protested an intent to repay Mackensen for the tires. The linguistic barriers which separated Colonel Walters from Mackensen were distinctly modest and insubstantial ones, since the former admitted to the presence of a bilingual secretary in his own office. Moreover, the young German lady with whom the accused maintained friendly relations — to the extent of sharing hotel accommodations and participating in frequent pleasure jaunts — could converse acceptably in English, and presumably could have learned from Mackensen, for the benefit of the accused, the cost of the tires in question. The contention of Colonel Walters that he was much too busy to find a free moment in which to recompense Mackensen was undercut by his admission that he had possessed sufficient leisure for numerous recreational excursions. Without branding the accused's account of his intention to repay Mackensen as inherently incredible, we are inclined to regard this testimony as so damning as to require rejection of the conclusion that he was in any way prejudiced by the errors previously recited. Thus, no warrant exists for reversing his conviction of the violation of Army Regulations through receiving a gift of five tires.

Much the same may be said of the finding that the accused made a false statement concerning his presence in the company of certain German Nationals. Guilt under this specification was established principally through the testimony of several witnesses, none of whom was refuted by the defense. Although some confusion occurred in the original transcription of a German name mentioned in the statement, there was no real question as to the designation of the person to whom the accused was referring when he made the allegedly false assertion. The motive for falsification was made obvious by developments subsequent to the making of the statement.

The literal untruth of the accused's account in this particular was established beyond question by means of a photograph taken by the German female companion previously referred to. This photograph located Colonel Walters in the company of the very persons with whom his statement denied he had associated. The genuineness of the photograph, and the accuracy of its representation, could scarcely have been impeached by the defense, since as to other charges, the accused's lawyer was compelled to rely on the German girl who had taken the picture. While the accused did not testify under this charge — and thus made no incriminating admissions — we must reason here as we did with respect to the charge that he had received illegal gifts. In short, the errors considered are so completely dissociated from this offense, and the evidence of guilt so overwhelming, that we perceive no basis for reversal.

IX

It follows from what has been said that we affirm only the findings of guilty of having made a false official statement and of having illegally received gifts, in violation of Army Regulations.[5] The record of trial is returned to The Judge Advocate General, United States Army, for possible reassessment of sentence.

We observe that the officer who served as law officer in the case at bar is now a member of the board of review which earlier considered this record, although he was replaced for the purposes of this specific case. In view of the irregularities which have marked the history of

---

[5] Since the issue concerning the instructions on sentence related to the charge and specification that we have disaffirmed, discussion of that issue is unnecessary.

the cause, and to avoid further untoward appearances in its dispositon, it is directed that, on reconsideration, the record be referred to a board of review other than that which previously passed on it.

Chief Judge QUINN concurs.

LATIMER, Judge (concurring in part and dissenting in part) :

I concur in part and dissent in part.

The first important question in this case offers us an opportunity to fill in one of the interstices in ▇▇▇▇ ▮ military justice procedure. While the author judge has reached the correct conclusion on our right to consider the out-of-court conferences, I do not believe his reasoning will bear up under close examination. I, therefore, offer my views on the procedural question labelled "the battle of affidavits." I shall first state my conclusions, then set out the reasoning which leads me to my results. I conclude the documents filed at the level of the convening authority are part of the record on appeal and before us properly, while the one filed at the time the case was in the bosom of this Court is not.

I cannot adopt the certificate of correction approach because it is an artificial adaptation of a means to prevent an alleged injustice and it is not necessary to resort to artificiality to reach the error complained of herein. Moreover, it may miss one important step in military justice procedure, i.e., some officer or judicial tribunal with authority to weigh facts must consider and decide the issue. I use the word, artificial, because if the issue was not presented to and decided by the court-martial, then it did not occur at the trial and an arbitrary treatment of post-trial papers as certificates of correction is contrary to well-known methods of raising matters properly for the first time after trial. Furthermore, the court's reasoning, that whether a document is part of the record depends upon whether the irregularity occurs before or after findings, is not genuine. The time an irregularity happens should not be the touchstone, as all out-of-court incidents which deny an accused a fair trial must, of necessity, happen before the trial is over, but they are not all part of the record of trial. Those which occur subsequent thereto may prejudice his rights to an adequate appeal and be part of that record but they do not infect the findings and sentence as such. The criteria I would rely on to determine whether the documents reflecting out-of-court irregularities are in the record on appeal and can be considered by us are the time and manner in which the issues were raised and by whom they were decided. The Code recognizes that matters dehors the record may be raised properly before a board of review, and before this Court, by a petition for a new trial, and those petitions may be founded on circumstances and events which occurred prior to findings. In petitions for new trials, certificates of correction need not be used to frame the issues; and I fail to see why written documents composed in any legal and recognizable form, which are filed with the convening authority and which seek to invoke his power to correct injustices that brought about an unfair trial, should not be considered as petitions for rehearing. One can hardly say the issue in this case was presented to and passed on by the court-martial, and yet those are the proceedings which should be reflected in the record of trial. That is not to say that had the same issue been presented to and considered by the law officer or the court-martial, it would not be part of the record of trial. But the timing makes a difference; and I fail to understand how officers of a court-martial can certify to incidents which were raised after they had completed their task. In short, the method adopted by the court co-mingles trial issues and collateral issues and I would prefer to keep them separate and apart.

I might fortify my reasons by referring to the particular documents in this case. All that appears in the record are four unsworn but signed statements from four parties participating in the trial which relate different versions of two events. Not one fact contained in them was brought properly before the court-martial. If I assume that the collateral proceedings were initiated by counsel for the accused, a fact which is

**637**

not supported by the record, then I pose the following question. Can counsel for one convicted of and sentenced for a crime add to a record of trial by attaching to a record in the hands of a reviewing authority a signed letter in which he states there were irregularities which happened out of the presence of the Court? If he can, then every record becomes subject to revision by the simple expedient of writing a letter to the first reviewing authority. In this instance, defense counsel's own statement merely avers he is calling the out-of-court hearings to the attention of reviewing officers and if that amounts to a certificate of correction then it is a most informal process. Certainly if all I could find in this record were four unsworn statements attached to the record of trial, I would have no hesitancy in declaring that we could not consider their contents. I would arrive at that conclusion regardless of when it was alleged the irregularities occurred. Furthermore, we should not consider letters addressed to a convening authority in the nature of certificates of correction. After all there is some merit in requiring compliance with rules of procedure and they should not be warped because the dispute in facts is not serious.

We are not without power to consider the merits of this controversy and I can find a well-accepted and legal method of considering the documents. There are certain well-recognized legal means by which issues can be framed. If this same issue were not raised until the case had reached the board of review or this Court, it would be incumbent upon counsel for the accused to file a petition for a new trial supported by affidavits. Counsel for the Government would be afforded an opportunity to file counter-affidavits and the board of review or this Court could proceed by one of two methods. If the petition and affidavits on their face failed to show that the petitioner was entitled to any relief, then the petition could be denied. On the other hand, if they were sufficient or either party desired to present further evidence, steps could be taken to see it was obtained. That process permits the framing of issues, the taking of testimony, and it affords each party an op-

portunity to be heard. If necessary, a factual determination could be made and a decision reached. As previously stated, the Code recognizes this type of procedure by providing that when the case is on appeal, at any time within one year after the convening authority has acted, the accused may petition for a new trial. I am of the opinion that comparable proceedings can be recognized by all reviewing authorities. I do not believe that Congress, when it mentioned the time element of one year after the action of the convening authority, intended to preclude asking for similar relief prior to the time of his action. Rather I am convinced that it concluded the convening authority possessed that power and could exercise it on his own motion, if he were inclined to act. It would indeed be an expensive absurdity to permit a board of review, or this Court, to grant a new trial on the well-recognized grounds of fraud on the court, and at the same time deny the first reviewing person the same authority when he had as much or more power than subsequent reviewing authorities.

The Uniform Code grants the convening authority the right to disapprove the findings and sentence of a court-martial and to grant a rehearing. It grants him unlimited power to benefit an accused as Article 64, 50 USC § 651, limits his determination only by his sound legal discretion. The Manual amplifies the Code and paragraph 86b enumerates the matters he must determine before he can approve the findings and sentence. Subsection e of the paragraph is a general clause which requires that he determine there are no errors in the proceedings which materially prejudice the substantial rights of the accused. That particular subsection refers to paragraph 87c of the Manual, and an illustration is used therein to show what might be considered:

"Regardless, however, of the test in the subparagraph above, if the error is such a flagrant violation of a fundamental right of the accused as to amount to a denial of due process (e.g., *when the disloyalty of defense counsel directly aids the prosecution*) the finding must be disapproved re-

gardless of the compelling nature of the competent evidence of record."

I am content to use the illustration as the basis for an argument that the convening authority may permit a formal or informal hearing before him. Ordinarily disloyalty of defending counsel will not be reflected in the record of trial. One very appropriate method by which I believe this could be called to the attention of the convening authority would be by petition for rehearing supplemented by accompanying affidavits. I do not believe that Congress or the President intended to grant wide discretionary powers to him, and then defeat the grant by requiring application of the strict rules of procedure governing appellate courts. Neither do I believe they intended to grant an accused the right to have a convening authority grant a rehearing for any matter which denied accused a fair trial and not grant him a remedy to reach it. Common sense dictates that issues which go to the very heart of a fair trial should be raised at the first opportunity, and to require an accused to wait until his conviction had reached a board of review or this Court before he could raise matters affecting the integrity or fundamental fairness of the trial would be costly and time-consuming, and inconsistent with orderly appellate procedure. The fact that due diligence may be involved in this type of a hearing argues for an early disposition even though it might not have been present in this instance. The convening authority has always been considered an important and necessary part of the trial and appellate processes of the court-martial system and I am positive that no member of the court is inclined to limit his authority to consider matters which may tend to benefit an accused. Certainly all I demand is that proceedings be initiated before he acts. While the Code and the Manual do not prescribe the precise method by which a denial of a fair trial may be brought to his attention and preserved for appellate review, I believe this case affords a vehicle for us to prescribe the means. The one adopted by the Court is, however, far from the best.

A preferred practice would be to file a petition for rehearing setting forth the reasons why a fair and impartial trial was denied the accused. The petition should be fortified by affidavits of the parties having knowledge of the facts. Copies of the petition and affidavits should be served on trial counsel, and if there is any merit to the contention the Government should be afforded an opportunity to meet the issue. The convening authority should then consider the questions raised and he should pursue the matter in the same manner as would any other fact-finding body. If he concludes the allegations of the petition state a cause for relief, and they are supported by evidence, he should grant a rehearing. If he concludes otherwise, then the motion should be denied. The pleadings filed, the evidence taken in support thereof, and the ruling made become part of the record on appeal, to be reviewed by the board of review and possibly this Court. While such formality may not be demanded, it is desirable or the issues may not be preserved adequately for review. This is not an unknown method of attacking the fairness of a trial or of raising out-of-court incidents. While the steps I have detailed are not prescribed in the Code or the Manual, implicit in its provision is authority for my contention that the error is reachable in some such manner. If other methods are to be used, it is of importance to remember that the basic requirement of any proceeding is that each party have notice of the contemplated action and a fair opportunity to present its side of the dispute.

While the procedure used in this case was informal and does not meet the standards which I have prescribed, for the reason I hereinafter mention, the Government is precluded from contending it fails to meet minimal requirements. The record does not show the manner in which this proceeding was initiated. The convening authority may himself have heard of the incident and concluded to have the facts developed. Again, it may be it was initiated by either defending or trial counsel. The reason for the uncertainty is that the documents are not properly captioned; the dates the letters were submitted are

not shown, unless they were filed on the days of execution, and one is undated. If they were filed on the dates of execution, statements of the Government officials were filed prior to those of the defense. However, regardless of the informality, the convening authority and both parties were content to treat them as sufficient to present the issue and call for a ruling. Had the prosecution elected to require a more formal presentation, it could have demanded the filing of an initiatory pleading and insisted that the testimony be submitted in affidavit form or under oath. Likewise, defending counsel could have required that the Government formalize its contribution to the dispute. Instead of demanding formality, all parties at that level were satisfied and the matter in dispute was decided by the convening authority. Irregularities in titling papers can be waived; and in this instance there can be no complaint about lack of notice as each party was afforded an opportunity to present its side of the issue. If a convening authority, with power to decide a question, and counsel for the Government are satisfied that a matter is before that authority, and he acts, they are estopped from contending the predicate for his action is not part of the record. For the foregoing reason I would necessarily hold that the post-trial proceedings before the convening authority and the statements contained in the letters were in substance a proceeding for rehearing and properly in the record for the purpose of review.

Because I believe that collateral matters which involve the resolution of factual disputes must be ▮▮▮▮▮ ▮ treated in substantially the same manner as questions of fact posed at trial, I would strike the affidavit filed while the case was on appeal. Had the Government requested permission to furnish additional evidence to present to the reviewing authority, or had the accused desired to be accorded the same right, a request should have been submitted to the reviewing officer. Parties cannot litigate factual matters at one level and seek merely to strengthen their case, or weaken their opponent's, by filing additional affidavits after a decision has been reached and the case is on appeal. All evidence should be presented to the fact-finding body and, except in unusual situations, it is too late to strengthen a factual issue after it has been decided. The principles controlling collateral issues are the same as those governing the trial proper.

This brings me to the heart of the controversy. My associates seem to treat the issue as one of originality in this Court. I do not. One reviewing authority with fact-finding powers has passed on the question involved and I consider our review limited to a question of whether the ruling of the convening authority was incorrect as a matter of law. If we were to use that test, the conviction would have to be sustained as the facts contained in the post-trial statements would support clearly a finding in favor of the prosecution. However, for the purpose of deciding this case, I will consider the evidence most favorable to the accused. Prior to discussing the out-of-court conferences, I shall discuss the three incidents my associates use to bulwark the conclusion that the law officer fundamentally misconceived his duties as a judge. There is a mild concession in the Court's opinion to the effect that the law officer was engaged in a trial of a difficult case. I concur in that concession. Moreover, defending counsel did his best to aggressively defend his client. In that setting it is not difficult to single out comments made in the heat of battle from a record and inflate them to the proportions of serious breaches of judicial deportment. In this instance the "in court" incidents ▮▮▮▮▮ ▮ were, in my opinion, kept within the bounds of a fair trial and perhaps the most persuasive way for me to meet the arguments of my associates is to reproduce the record. There are three instances which are referred to in the majority opinion. In chronological trial order they are found in the following separate distinct comments by the law officer: (1) A statement made in a course of ruling on exclusion of witnesses, (2) a reference to defending counsel returning to law school, and (3) a remark about defend-

ing counsel being presumptuous. Torn out of context and presented in a most unfavorable light, they have a tendency to create the impression that the law officer spent his time berating defense counsel. My reading of the record convinces me to the contrary. These instances occurred during a vigorously contested trial which occupied the better part of five days. It is conceded that the number might be unimportant if they were of an aggravating nature, as one untimely comment might have an adverse effect on accused's defense and the good faith of his counsel. But we are not presented with that kind of a record and I suggest we look at these three through the medium of the written words.

The background of the first may be gleaned from the following statement. The trial stage had progressed through the arraignment; trial counsel had presented his authorities; defense counsel had waived their presentation; and trial counsel had just announced he would like to make an opening statement. The record furnishes us with complete information of what followed, and the relevant part is as follows:

"LAW OFFICER: One moment. Are any of the people sitting in the audience to be witnesses in this case? Are any of the people sitting in the audience agents or representatives of persons who are to be witnesses in this case?

(Several persons withdrew from the spectators' section of the courtroom and withdrew from the courtroom altogether)

LAW OFFICER: Does the defense have any objection to the action taken by the law officer?

DEFENSE: The defense possibly has an objection to a discussion with the law officer by the prosecution out of the presence of the defense.

LAW OFFICER: State your objection. We will note it on the record.

DEFENSE: I have stated it. That's my objection.

LAW OFFICER: It will be noted.

DEFENSE: Prosecution discussed this matter with the law officer without the defense being present.

PROSECUTION: I'd like the record also to reflect, if the law officer please, that any discussion that took place between the law officer and the trial counsel took place before this court was called to order and that the only statement made by the trial counsel to the law officer was that witnesses were present in the courtroom with their attorneys.

LAW OFFICER: The whole matter is insignificant and not worthy of any more comment. There is no rule that I know of that precludes the prosecution's discussing something with the law officer out of the presence of the defense counsel."

The next quotation from the record must be considered in the light of what had occurred previously. On a previous day it appeared that the trial might be delayed because of the failure to have witnesses available. The law officer directed defense counsel to have their witnesses available on the following morning at 9 o'clock. Individual counsel, in no uncertain terms, informed the law officer he would try his case as he pleased. Near the end of the taking of testimony in the fourth day all parties had finished with a witness and it appeared the taking of evidence might be concluded. This is the relevant part of the colloquy with which we are concerned.

"LAW OFFICER: Does the court members have any pleasure with respect to continuing at this time without dinner?

PROSECUTION: I want to ask this now. The prosecution has one rebuttal witness and if he can have just a few minutes to work with defense on a stipulation . . .

LAW OFFICER: Let's have a five minute recess."

After the recess, defending counsel presented a stipulation which contained evidence of good character of the accused. The colloquy continued after the stipulation was admitted.

"DEFENSE: This is an oral stipulation to be admitted into the record.

We defer to the prosecution at this time who is desirous of calling a rebuttal witness out of order.

PROSECUTION: May I proceed, sir?

LAW OFFICER: What is the status of the defense at this time?

DEFENSE: The defense is not determined whether it will rest its case yet until after the supper hour. The prosecution apparently has this witness present.

LAW OFFICER: Aren't you being presumptious [sic] in presuming that we are going to eat?

DEFENSE: I think that is a fair presumption to make.

LAW OFFICER: Aren't you ready to proceed at this time?

PROSECUTION: Sir, I have a rebuttal witness. The witness is available at the present time. Defense counsel has asked me whether I would consent to letting him wait to make his decision as to whether he will rest his case at this particular time, and I said it was perfectly all right with me, but I asked him if he would let me call a rebuttal witness out of order. Defense counsel says that he has no objection, and if the court sees no objection, I would like to call the rebuttal witness at this time.

LAW OFFICER: Call your witness."

In order to present the third instance in its true perspective, it is necessary to state that trial counsel was examining a witness on an apparently inconsistent statement. Without the prompting of defense counsel, the law officer interjected himself into the examination and this is the part played by the cast of characters:

"LAW OFFICER: Is this the prior inconsistent statement you are proving?

PROSECUTION: Just a moment.

DEFENSE: I will object.

PROSECUTION: State your objection.

DEFENSE: It's improper.

LAW OFFICER: Sustained.

DEFENSE: I feel like I am back in law school.

LAW OFFICER: It might not be a bad idea."

I shall not belabor my opinion by arguing that the law officer dignified his calling by his comments, but I am considering the guilt of the accused and not the shortcomings of the presiding judge. The latter are only important if they can be converted into conduct prejudicial to the accused. To realize how little they could bear on that subject, one need only keep in mind that no act or statement bears on the guilt or innocence of the accused or suggests any opinion by the law officer on the merits of the cause. At worst they are unnecessary trial banter which is present in many hotly contested law suits but they are not of such a damaging character that the triers of fact would be swayed in their judgment on the merits. To convert these incidents into prejudice is to raise minor imperfections in human behavior to the level of an unfair trial. Some latitude must be allowed for comments made during unexpected happenings as time does not permit perfection in the choice of words.

I pass now to the out-of-court conferences. Two references to the record might throw some light on this issue, particularly in regard to the holding that the law officer embarrassed the defense. The first sheds light on the legal capacity of individual counsel. Parenthetically, I might add assistant defense counsel was a major who had been certified by The Judge Advocate General of the Army and he seems to be the forgotten man. In relating his own qualifications individual counsel stated:

"Individual Counsel, M. Philip Lorber is a member of law firm Lorber and Vogel, practicing law in this command by special permission of HICOG and USAREUR. I am a member of the Bar of the Supreme Court of the United States and a Lieutenant Commander in the U. S. Naval Reserve with a Legal Specialist designation.

• • • • • •

"I would like to be heard and I would like to state that in twelve years that I have been before court-

martial boards in the Army and Navy . . ."

The second reference compromises in some degree the claim that the law officer involved defense ■■■■■■ counsel in a difficult position when he suggested the latter might enlighten the court-martial members on German law. At one stage in the course of the trial defense counsel called a colonel to the witness chair as a character witness. After his direct and cross-examination had been completed, a court member sought to question him. Without any prompting on the part of defense counsel, the law officer refused to permit the question to be answered on the grounds it was outside the scope of the direct examination. He, however, suggested that if the court desired to make the witness its own, the question could be answered without the necessity of holding the witness for recall, a practice which I venture to suggest is not without precedent. Before permitting an answer, he asked defense counsel if there was any objection. Counsel refused to state whether he would or would not object as he contended it would place him in the embarrassing situation of arousing the ire of court members if he opposed an answer to the question. If the court members were uninformed about the inferences they should draw from the acts, conduct, and tactics of defense counsel prior to that time, the matter was set at rest by the law officer when he stated:

"LAW OFFICER: Mr. Lorber, as you are here defending the rights of the accused nothing can put you in an embarrassing position. Your duty, as you and I know it, is to safeguard the rights of the accused."

In the light of this and other incidents reflected in the record, I have no doubt that members of the court did not convert Mr. Lorber's refusal to express an opinion on the German laws into a hostility toward the accused.

The remaining errors which the court piles on those previously ■■■■■■ mentioned to find prejudice arise out of two out-of-court transactions. We are all agreed

that the first conference on January 20, 1953, was relatively unimportant. That conclusion is inescapable when the evidentiary contents of the statement of defense counsel is weighed. It contains no showing of any impropriety or irregularity, except the presence of the law officer in a room with court members; and it avers the reason the alleged error was not mentioned until sometime after trial was that since the date of the occurrence defense counsel has been more fully apprised of the law. He, of course, had a fair appreciation of the law on unauthorized communications on the first day of the trial when he registered his objection to the trial counsel talking over courtroom administration with the law officer.

The second conference is the only irregularity appearing in the record which I find of sufficient ■■■■■■ importance to warrant serious consideration. However, when it is viewed as a part of the total picture, it vanishes into obscurity. The written statements to support the events were prepared some three months after trial; and, as can be expected, in certain details they appear inconsistent with the record of trial. I need not point out these inconsistencies as I will accept defense counsel's statement at face value. According to him the subjects discussed were: (1) hours of attendance; (2) time of adjournment; (3) the procuring of additional evidence, particularly with respect to whether the accused still had the tires and the car; and (4) the status of German laws. One cannot contend reasonably that discussion concerning hours of attendance and time of adjournment are of any significance prejudicially speaking. More to the point on those matters is the fact that counsel for accused knowingly consented that they be the subject of discussion. The subjects encompassed in my third subdivision are not identified clearly by counsel's statement; but, accepting it in its broadest implications, I believe the record will establish that everything mentioned fairly in the affidavit was the subject of debate in open court in the presence of the accused and his counsel. To sup-

port this statement, I will quote two exchanges between the president and other members of the court which are found in the transcript:

"PRESIDENT: The court would like to determine at some time during the proceedings what kind of tires Col Walters has on his car, if he still has a car.
PROSECUTION: Yes, sir. I will try to determine that."

. . . . . .

"PRESIDENT: Do we want to bring up this question of witnesses in order to aid calling the witnesses for the trial.
LAW OFFICER: I might say for the record that the proper time to ask for additional witnesses, and as we call them 'court witnesses', would be at the end of the case. But since it would be more convenient and would give people an opportunity to obtain these witnesses, the court might now make known its desires and requirements.
PRESIDENT: The court expects the testimony of Mr. Karle or a suitable deposition; a tax expert to answer questions relative to laws governing exemption from liquor taxes in the Federal Republic; German Taxes; a qualified witness to testify as to Lt Col Walters' functions and duties during the summer and fall of the year 1951; the testimony of Capt Marcus and Col Cassidy. That completes the list of witnesses at this time."

These statements disclose the area of uncertainty in the minds of court members and identify generally the evidentiary fields which were to be explored. The subjects of discussion in the out-of-court colloquy are encompassed within the enumerated fields; and it would, therefore, appear to me that for the law officer and members of the court-martial to discuss the same information in the presence of defending counsel, but not in the presence of accused, would not infringe on any substantial right of the accused. If there had been ground for any objection on the part of the accused or his counsel to the court discussing with the law officer the ne-

cessity of calling additional witnesses, there was ample opportunity to note the objection while the court was announcing its desires in open session. Defending counsel did not register any complaint; but, on the contrary, he joined in the discussion directly with the president of the court.

If there was any subject discussed in the questionable conference which remotely suggests prejudice, it must be found in the dissertation on the status of German laws. In disposing of that issue, I first reiterate the language found in the majority opinion which states in substance that the "off the cuff" opinion given by the law officer in the anteroom became the law of the case when he instructed the court-martial members at the end of the trial. Those instructions were given in the presence of accused and his counsel. No objections were taken and there is no valid contention that the instruction incorrectly states the law. We have held under more aggravated circumstances that error committed out of court may be cured by repeating the performance in court; so this incident must be measured to determine the possibility of prejudice which might flow from the asserted inferences suggested by my associates. My imagination must be lacking for I am unable to find in the conduct of defense counsel any predicate for a reasonable person to draw the inferences so carefully spelled out in the court's opinion. In the quiet of an appellate chamber many finely drawn inferences can be supposed, but during the trial of a case the court personnel have their time occupied with the merits of the case. If any unfavorable inference might have been drawn from defending counsel's failure to render any opinion, it would be that he was willfully withholding information the court was entitled to be given. If that were the inference, which I cannot believe, it would amount to a belief that counsel was dishonest with the court-martial and he would be thoroughly discredited. The Court's opinion could not stand if that conclusion was reached as it would require skillful manipulation to hold that that type of prejudice did not infect all findings. If we are to venture

into a world of reality and not one of speculation, then I suggest court-martial members are human and they may form opinions of defending counsel; but if they do, and it is unfavorable, the predicate is found in the behavior, deportment and tactics displayed throughout the trial and I find nothing in this record to suggest to me that the members of the court-martial took umbrage of counsel's method of conducting his defense and literally "took it out" on the accused. According to defense counsel's statement, trial counsel, not he, broke up the meeting by announcing the discussions should be discontinued, so it is a bit difficult to conceive why court members should be offended against the accused. It is informative to mention that while appellate defense counsel chose some nineteen errors to substantiate a claim of cumulative error, a claim that defense counsel was discredited was never mentioned. The individual trial counsel in this case was a Lieutenant Commander in the Navy, with twelve years' experience in Army and Navy court-martial cases; he was a member of the bar of the United States Supreme Court; had been authorized by United States authorities to practice in Germany; and I believe he will be astonished to find that this Court suggests the court-martial members might have inferred that his refusal to answer was because a true answer might prejudice his projected arguments. Perhaps I should ask, were they to be founded on principles which were not the law?

It would serve no useful purpose for me to argue each inference which my associates suggest might have entered the minds of the court-martial members. Suffice it to state that the difficulties I encounter in this case are two-fold. First, I cannot convert the errors mentioned by my associates into a mass of sufficient size or importance to have any measurable impact on the finding of guilty on any specification. Second, if I could join with them on the shock of the law officer's acts, I would be required to reverse all findings. In connection with the first difficulty, the alleged effect is so imaginary that it cannot be seen regardless of the mag-

nifying power of the spectacles used by the observer and it cannot possibly reach the level contended for by the Court. I do not believe any reasonable man who is charged with the responsibility of determining the guilt or innocence of an accused person would toss the alleged irregularities on the part of the law officer, as to the first specification, into the scales of justice and permit them to influence a decision.

Assuming for the sake of argument that I am in error on the first ground then the character of the errors are such that I would be required to vote for a reversal on all specifications. Generally speaking, there are six grounds that the Court uses in arriving at the totality of cumulative error. These are: (1) The law officer fraternized with court members, (2) the acts gave the appearance of "impurity" on his part, (3) he was impatient with defending counsel, (4) he placed defending counsel in a position where the latter was compelled to criticize him, (5) he placed defense counsel in a difficult position by requesting an opinion on the law, and (6) a question was asked by a court member concerning the conspiracy charge which the law officer ruled was improper and it was not answered. The first four grounds would affect all specifications and their nature is such that if accused was entitled to a rehearing on one offense because he was denied a fair trial he should be given the same consideration on all offenses. As to the fifth ground, the same reasoning can be applied. If inferences mentioned in the Court's opinion can be drawn reasonably, they would affect adversely the integrity of defense counsel and, if he lost face with the court members, the impact would affect his legal and factual contentions on all offenses. The last ground is so trivial that I would give it no weight.

The evidence on the specifications affirmed by the Court is compelling but the same thing can be said about the particular one reversed. The accused took the stand to testify on one specification but did not offer any testimony on the conspiracy charge. There is no dispute in the evidence and while the testimony of witnesses who testified

**645**

for the Government was reluctantly given it was ample to compel a finding of guilty. Moreover, accused admitted to a fellow officer his complicity in the conspiracy. Viewing the record from its four corners, the accused is entitled to all or nothing.

I would affirm the findings and sentence.