UNITED STATES, Appellee

v.

LLOYD W. DEAIN, Seaman, U. S. Navy, Appellant,

5 USCMA 44, 17 CMR 44

45

46

No. 4590

Decided October 15, 1954

CDR P. E. Cherry, USN, and MAJ Charles J. McCaffrey, USMCR, for Appellant.
CDR Richard J. Selman, USN, for Appellee.

### Opinion of the Court

ROBERT E. QUINN, Chief Judge:

On September 16, 1953, a general court-martial convicted the accused of desertion and two other offenses against the Uniform Code of Military Justice. The court-martial imposed a sentence which provided in part for dishonorable discharge and confinement at hard labor for one year and six months. On review, a board of review reduced the finding of guilty of the desertion charge to that of the lesser included offense of unauthorized absence and otherwise affirmed the findings of guilty. It also mitigated the sentence to a bad-conduct discharge, confinement at hard labor for ten months, and total forfeitures. We granted the petition for review to consider certain issues raised by the accused which result from denial of his challenges for cause.

As is usual, the record of trial includes a copy of the order appointing the court. This shows the Commandant, 12th Naval District, to be the convening authority. All designated members of the court were present at the trial. These were Rear Admiral T. Ruddock, Jr., United States Navy, Retired, who was appointed and acted as the president of the court, Captain Tiemroth, Commander Whitaker, and four other lower-ranking officers. The accused examined on *voir dire* Admiral Ruddock and Lt. Commander Savage, the law officer. At their own requests, Captain Tiemroth, and Commander Whitaker were also examined.

It appears from the *voir dire* examinations that Admiral Ruddock was assigned to the 12th Naval District by orders of the Bureau of Personnel for the purpose of acting as president and permanent member of the court. Captain Tiemroth and Commander Whitaker were also permanent members, but there was no showing that their assignments were specifically designated by the Bureau. Admiral Ruddock prepared, and submitted to the convening authority, fitness reports on the permanent members. These mem-

**47**

bers were aware of the practice. Although Admiral Ruddock conceded that the permanent members "would be very foolish" if they did not try to exhibit qualities of intelligence, judgment, and initiative in order to obtain the best possible report, he "certainly" hoped that this circumstance did not put him in a position to influence the other officers. The reports were based on the Admiral's observations of the officers as members of the court, but were not predicated upon the deliberations of the court. They also included information obtained from "such contacts as I might have in the office and discussion of general naval matters." Both Captain Tiemroth and Commander Whitaker declared that the possibility of further promotion was so remote that they would not be affected by an unfavorable fitness report.

Every time a new court convened, Admiral Ruddock conducted a short period of indoctrination for the court. He was "not sure . . . at all" whether he had been specifically authorized to do so by the convening authority, but he believed that "an inexperienced member needs to have his attention invited to Articles which he should know about before coming into court." His instruction was largely concerned with paragraphs 74, 76, and 138 of the Manual for Courts-Martial.

In the indoctrination period, Admiral Ruddock discussed with the members of the court the question of what constitutes a "prolonged absence." He usually advised the members that whether an absence is prolonged is a matter of fact to be determined by the court, but "that as some guide, the framers of the Manual have, in the Table of Maximum Punishments, given the court some tentative guidance." In that connection he usually discussed the matter of punishment, "jumping" from under sixty days to over sixty days, as covered in the Table. He did not in any way, however, personally attempt to control the deliberations of the court. He insisted that each member of the court had taken an oath to decide the issues according to his own conscience, and, "that in this courtroom there is nobody going to control the actions of anyone, except his own conscience." According to Captain Tiemroth, every time the court closed for deliberation, Admiral Ruddock reminded the members that their actions should harmonize with their consciences.

Admiral Ruddock stated that he was familiar with the presumption of innocence. He did not recognize it as a constitutional right because he believed that persons in the military services had no constitutional rights. However, the presumption existed in military law because Congress had chosen to grant it to an accused. When asked whether he had not, at various times, said that if a case is referred for trial, "the accused must be guilty of something," he replied, as follows:

"I have stated that in the Navy, that as a rule, that if a case is referred for trial, that there is a likelihood that some offense has been committed; that it is very likely in the light of the accurate identification usually effective in the service, that identification in the case is likely to be correct. However, the presumption of innocence goes with him until evidence has been produced to show that the individual before the court has committed an offense."

After Admiral Ruddock's examination, defense counsel called Commander Savage as a witness. Since June 1952 Commander Savage had intermittently served as law officer for the court. He had frequent conversations with Admiral Ruddock. At various times he had heard him say, "that anyone sent up here for trial must be guilty of something." Trial counsel did not question the witness.

Defense counsel challenged Admiral Ruddock on two grounds "under paragraph 62f(1)." The first was for bias or general prejudice "against any accused brought to trial before this court"; and the second was, that he was in a position to influence improperly the permanent members of the court "through the extrajudicial means of preparing fitness reports" on at least two members of the Court. The challenges were not sustained. Later, the accused challenged Captain Tiemroth

48

for cause, on the ground that he was subject to influence by the president through the medium of the fitness report. The challenge was not sustained. Thereafter, the accused peremptorily challenged Commander Whitaker.

This appeal seeks to review the correctness of the court's rulings on the challenges for cause. Preliminarily, the accused questions the procedure by which members of the court, who were subject to challenge on substantially the same ground as that of the president, were permitted to vote on the challenge. This contention was considered by us in United States v. Adamiak, 4 USCMA 412, 15 CMR 412. It was there held that while the Court would prefer a more desirable rule, the "service practice seems uniform in demanding that one member's challenge be considered at one time, and that all members vote thereon, save him whose competency is to be determined." Therefore, we proceed directly to consider the merits of the challenges.

According to the provisions of the Manual, certain challenges are self-operating, and, in the absence of any objection or question, require that the challenged member be "excused forthwith." Manual, paragraphs 62f, 62h (2), pages 91–93. United States v. Bound, 1 USCMA 224, 2 CMR 130. One of these is that the challenged party is not eligible to serve as a member. Manual, paragraph 62f (1). At the trial, defense counsel asserted this ground as the one upon which he relied. Primarily, however, eligibility to serve was not the issue. The president of the court was an officer on active duty and had been duly appointed as a member of the court by competent authority; he was not the accuser or a witness for the prosecution; and he had not acted as investigating officer or counsel in the same case. Article 25, Uniform Code of Military Justice, 50 USC § 589. Although defense counsel referred to the wrong subdivision of the Manual to describe the category of challenge, no doubt exists as to his true intent. The voir dire examination was devoted entirely to a showing of general bias and improper influence. If established, these grounds properly present a basis for challenge under paragraph 62f (13), which provides for challenge "in the interest of having the trial and subsequent proceedings free from substantial doubt as to legality, fairness, and impartiality." All parties clearly understood the nature of the challenge. Under the circumstances, the misstatement of the classification of the challenge should not deprive the accused of an appellate review on the merits. See Snyder v. State, 151 Ark 601, 237 SW 87.

Fairness and impartiality on the part of the triers of fact constitute a cornerstone of American justice. It may no longer be true, as it was in Lord Mansfield's day, that a juror must be "white as paper," but an accused is still entitled to have his guilt or innocence determined by a jury composed of individuals with a fair and open mind. Transient or "light impressions" of an accused's guilt or innocence will not disqualify a juror, if it is plainly demonstrated that such impressions will easily yield to the evidence presented in open court and to the law propounded by the trial judge. Reynolds v. United States, 98 US 145, 25 L ed 244. So, too, a general or abstract bias against particular classes of offenses or persons is not necessarily disqualifying. United States v. Noelke, 1 Fed 426 (CC SD NY 1880); Temple v. Moses, 175 Va 320, 8 SE2d 262. There can, of course, be no degrees of bias, but, essentially, the question of whether bias exists is one of fact. If the evidence touching the issue is in conflict, the balance must be struck by the person or persons having authority to rule on the challenge. There must be a clear abuse of discretion in resolving the conflict before an appellate tribunal, which lacks the power to reweigh the facts, will reverse a decision. State v. Dickson, 200 Iowa 17, 202 NW 225; Temple v. Moses, supra; People v. Martinez, 31 Cal App 413, 160 Pac 868.

Trial by a fair and impartial jury

**49**

does not include any guarantee to a particular kind of juror. So, a juror who is ignorant of the criminal law is not for that reason alone disqualified or incompetent. State v. Dreher, 166 La 924, 118 So 85, cert den 278 US 641, 73 L ed 556, 49 S Ct 36; People v. Conklin, 175 NY 333, 67 NE 624. Conversely, one learned in the law is not thereby unable to serve impartially as a court member. United States v. Glaze, 3 USCMA 168, 11 CMR 168. But whatever the special knowledge or degree of intelligence of the juror, the accused is guaranteed the right to fair and impartial jurors with completely open minds.

Appellate defense counsel have urged upon us Admiral Ruddock's statement that he did not regard military personnel as possessing any constitutional rights other than those which may have been duplicated by specific grants from Congress, and have also called our attention to his criticism of the Uniform Code. As to the former, we disagree with Admiral Ruddock. See United States v. Voorhees, 4 USCMA 509, 16 CMR 83. As to the latter, the record is silent concerning the particulars of his disagreement with the Uniform Code, but the omission is unimportant. As far as both matters touch our problem, we are unwilling to hold that, standing alone, they indicate sufficient bias or partiality against this accused, or accused persons in general, to sustain the challenge. Cf. Carnaggio v. State, 143 Miss 694, 109 So 732. The statements do indicate strange conceptions of military law, but the accused has not shown, and we cannot find, in these theoretical pronouncements any substantial danger to a fair and impartial trial.

More important in the accused's claim of bias is the allegation that Admiral Ruddock frequently asserted that "anyone sent up here for trial must be guilty of something." Evidence of such remarks by the president of the court were obtained primarily from the law officer, as a disinterested witness. However, even in his own testimony, Admiral Ruddock virtually conceded the truth of the charge. He expressly admitted that "as a rule" if a case is referred to trial, "there is a likelihood some offense has been committed." An attempt at qualification appears in his reference to the presumption of innocence, but the tenor of his statement expresses "the feeling, unfortunately present in the minds of many service officers, that 'the accused must be guilty or else the general court-martial would never have been ordered.'" United States v. Squirrell, 2 USCMA 146, 152, 7 CMR 22, dissenting opinion of Chief Judge Quinn. Expressions of opinion of this kind indicate a frame of mind unwilling and unprepared to weigh the evidence impartially.

An accused has no right to jurors who believe him innocent. People v. Redola, 300 Ill 392, 133 NE 292. However, he does have an unqualified right to jurors whose minds are uncommitted on the question. A juror who enters the jury box in the belief that the accused is guilty of something is inevitably disposed to give some color of guilt to the evidence. As was wisely said by the Supreme Court of Michigan in Stephens v. People, 38 Mich 739:

"It is idle to inquire whether or not they can return just and impartial verdicts; the more clear and positive were their previous impressions of guilt, the more certain may they be that they can act impartially in condemning the guilty party. They go into the jury box in a state of mind that is well calculated to give color of guilt to all the evidence, and if the accused escapes conviction, it will not be because the evidence has established guilt beyond a reasonable doubt but because an accused party was condemned in advance, and called upon to exculpate himself before a prejudicial tribunal, has succeeded in doing so."

In Grant v. State, 11 Okla Crim 396, 146 Pac 919, the court had before it an almost identical situation. On *voir dire* one of the jurors said: "I would think . . . [the accused] was guilty, or he would not be charged." On further examination, the juror also stated

that he did not consider the information as evidence, and the mere fact that the accused was charged would not cause him to return a verdict against him. The accused's challenge for cause was denied by the trial judge. In holding the denial to be error, the Oklahoma Criminal Court of Appeals said (page 921):

"To hold that this juror was impartial would reverse the humane and salutary rule of our law, which presumes the innocence of the accused and requires proof of guilt before conviction. We think that the juror McGuire was disqualified."

If the rule of the Grant case seems overexpansive, we need only relate the implications of the Admiral's testimony to other cases. In his reference to the presumption of innocence, Admiral Ruddock clearly understates the scope of the presumption. Apparently, he was satisfied to accord the accused the benefit of the presumption of innocence only until some evidence was introduced. It is significant that, although extremely careful to particularize his answers, Admiral Ruddock made no mention of the degree of proof he would require to overcome the presumption of innocence. This omission intimates that Admiral Ruddock would require the accused to present at least some evidence to overcome his opinion that there was "a likelihood" of guilt. A requirement of an affirmative showing of innocence puts upon the accused a burden which the law never intended. See People v. Barker, 60 Mich 277, 27 NW 539. In any event, Admiral Ruddock's testimony incontrovertibly demonstrates a fixed and deepseated disposition to give less than full effect to the presumption of innocence. A disposition of that kind seriously impairs a juror in his impartiality and disqualifies him from sitting in judgment on the case. State v. Rutten, 13 Wash 203, 43 Pac 30; Olive v. State, 11 Neb 1, 7 NW 444. As was said in the Olive case, supra (page 449):

". . . But how can this right, mercifully vouchsafed by the law, be enjoyed, if those accused shall be required to submit their cases to the decision of jurors who are either unable or unwilling to extend it?"

A further but equally serious barrier to Admiral Ruddock's qualification to sit in this case appears in his testimony regarding his pretrial orientation of new members of the court. Without concerning ourselves with the propriety of such conferences in the absence of authorization from the convening authority, we pass to the subject matter of his directions. Admiral Ruddock "usually" informed new members that the Table of Maximum Punishments provides "tentative guidance" for a determination of what constitutes a "prolonged absence."

A prolonged absence is of great importance in a desertion case. In the Manual discussion of that offense, it is said that "If the condition of absence without proper authority is much prolonged and there is no satisfactory explanation of it, the court will be justified in inferring from that alone an intent to remain absent permanently." Paragraph 164a, page 313. However, nowhere in the Manual discussion is there any attempt to set up an arbitrary demarcation between an absence of a duration less than sixty days and one greater than that period. True, the Table of Maximum Punishments provides a markedly different punishment for an unauthorized absence of more than sixty days than for one less than sixty days; but this provision is totally disassociated from any idea that one or the other of the periods constitutes a prolonged absence. According to the Manual, the phrase relates to the findings of guilt or innocence of an accused on trial for desertion and not to the punishment that may be imposed for a simple unauthorized absence. Since the law does not permit any inference of an intent to remain away permanently from the mere fact that an absence is sixty days in duration, a juror who uses such rule as a guide to his determination of the guilt or innocence of an accused cannot be denominated as impartial.

Although we have before us only the cold pages of the record, it is unmistakably clear that Admiral Rud-

dock had a fixed and abiding conviction concerning the validity of his personal formula for determining a critical fact in a desertion case. It is quite apparent that he developed the formula, not as a mere matter of casual opinion, but with the fixed idea that it was supported by the authority of the Manual. As we have had occasion to note before, the Manual is regarded as the "Bible" for military personnel. It is so important a source of military law that an opinion based upon it necessarily gives such strength and endurance to that opinion as to make it yield only to great persuasion. See State v. Joiner, 163 La 609, 112 So 503. In this case the accused was absent for more than sixty days. Consequently, the effect of such a predisposition is obvious. An accused should not be compelled to overcome not only the Government's evidence against him, but also an antecedent conviction which a court member brings with him to the trial. In that connection, what was said in State v. Crofford, 121 Iowa 395, 96 NW 889, is appropriate here:

". . . A person accused of crime should bear no greater burden than is created by the evidence produced against him on the trial, and the juror who passes upon that evidence should come to its consideration unhampered, and unembarrassed by any ready-formed convictions as to the vital fact or facts in controversy."

We have no doubt that Admiral Ruddock is a person of superior intelligence and pure purpose. Defense counsel at the trial and before this Court have in no way intimated that Admiral Ruddock did not intend to give the accused a fair trial. We also are convinced of his sincerity. But, we cannot overlook the unfortunate influences of his standards of guilt. His formula apparently represents the ultimate effect of his ratiocination on a very vital aspect of the case, and its impression on his mind indicates its influence in determining the accused's guilt or innocence. As the court said in Fitts v. Southern Pac. Co., 149 Cal 310, 86 Pac 710, page 712:

". . . No doubt such a juror would, to the best of his ability, try the cause upon the evidence and in-

structions of the court. In fact, there would be nothing else upon which he could try it. But he would still try it under the influence of the prejudice he honestly entertained, and which he nowhere announced either his ability or intention to divest himself of."

Our conclusion that the challenge of Admiral Ruddock for cause should be sustained because of bias would be sufficient to dispose of the case. However, one other issue raised in the case is such as may arise in other cases. Therefore, it seems appropriate that we comment briefly upon it. This issue relates to the effect of permitting the president of a court to submit a regular fitness report on permanent members of that court. The board of review below concluded that this circumstance raised a question of policy rather than of law. We take a different view.

It may be conceded that the mere fact that the senior, or other member of the court, coincidentally has the duty to prepare and submit a fitness report on a junior member, in and of itself, does not affect the junior's "sense of responsibility and the individual integrity by which men judge men." Dennis v. United States, 339 US 162, 94 L ed 734, 70 S Ct 519. So, if, as in the hypothetical case cited by the board of review, the convening authority designates two officers to serve on a court, one of whom is the normal reporting senior of the other, no reasonable man would believe that the senior is put in a position to exert undue control over the deliberations of the other. Their association as court members and the submission of a fitness report is not incompatible. We seriously doubt that either member would give thought to the fact that one is charged with the responsibility of reporting on the general fitness of the other. However, there is a different situation in the instant case.

The fitness report here is not of the usual kind. Rather it is directed to a specific purpose and a specific duty. Admiral Ruddock testified that, as

a basis for his reports, he considered associations with members other than those in the courtroom; undoubtedly, however, the more substantial basis for such reports, was his appraisal of the conduct of such individuals as members of the court. Since Admiral Ruddock made it a practice to show reports to the members reported on, they certainly knew what he thought of their conduct as court members. We are sure that these members possessed normal independence and fortitude, but human weakness frequently leads men to "crook the pregnant hinges of the knee where thrift may follow fawning." In our opinion, the omnipresence of these reports was so significant that the permanent members of the court could hardly effectively insulate themselves against it.

The members vigorously asserted that their promotion status was so hopeless that an unfavorable report could not materially affect them. That may be true. But, promotion is not the only purpose for which the fitness report is used. An "adverse" report could result in their removal from the court and assignment to some other less desirable duty. See Bureau of Personnel Manual, paragraph B–2202(2). Above and beyond all this, the legal propriety of the practice cannot turn on the assertion of the members that they were totally unaffected by the influence of the fitness report.

"It is the natural impulse of all men, with rare exceptions, when the direct question is put to them, especially by one in authority, such as a district attorney or a trial judge, to declare that they believe they can disregard a preconceived opinion and render a fair and impartial verdict upon the evidence submitted to them. In general, they are sincere in their statement and belief. The declaration, however, should not only proceed from the mouth of the venireman, but it should be made in connection with a state of facts showing that it is probably true." [State v. Joiner, supra, page 505.]

A court member's freedom and independence of action must remain inviolate. For his actions and his motives he should be responsible only to God and his conscience. Danger of infringement of these rights is generated by the fitness report here. Disinterested observers might discern the parallel of a "packed jury." As we noted, in another connection, in United States v. Walters, 4 USCMA 617, 16 CMR 191, an appearance of evil must be avoided as much as the evil itself.

For the foregoing reasons, the decision of the board of review is reversed. The findings of guilty and the sentence are set aside. In view of all the circumstances of this case, we believe that the interests of justice will best be served by dismissing the charges. Accordingly, the charges are hereby dismissed.

LATIMER, Judge (concurring in the result):

I concur in the result for two reasons. First, I desire to join Judge Brosman in his reservations. Second, there are certain matters found in this record which cast such doubt on the validity of the findings and sentence that no appellate court could find reasonably that this accused was granted a fair trial within the letter or spirit of the Code.

In making the latter assertion I do not consider the question of whether a permanent court is advisable or inadvisable, nor do I reflect upon other policy considerations, which may be found in this record. I do, however, consider that if a permanent court system is in operation, care must be exercised to make certain that several independent functions are not centered in one person. Here, the president of the court-martial became all-powerful and, in view of his pronounced views and his opportunity to influence other court members, he should not have been permitted to sit after challenge.

In some ways this case can be likened to the so-called "blue ribbon" civilian jury cases. Three senior officers were the cadre for all courts-martial in the District and they formed a formidable team. In this instance the order appointing the court-martial designated seven officers as members. In spread of

seniority they reached from the rank of Rear Admiral to Lieutenant Junior Grade. The three permanent members outranked those who were appointed for temporary duty as the former consisted of a Rear Admiral, a Captain, and a Commander. The Admiral was assigned to the Twelfth Naval District by the Bureau of Personnel of the Navy, and he was detailed as permanent president of the court by the same authority. While orders appointing him as a member of the court were issued by the Commandant of the Naval district, the appointing authority hardly had the same free mental choice in selecting court-martial personnel as would a commander unfettered by orders from high headquarters. I make no contention that the three permanent members were not qualified to sit on this or any other case, nor that we can or should look behind the Naval district order to test its validity. I mention the Department order only because it initiated a series of assignments which permitted the Admiral to perform in three complementary posts. Those were: the permanent president of the courts-martial; the instructor and orientor of the members of the courts-martial; and the reporting officer on efficiency reports of the other permanent members of the courts-martial.

The Chief Judge sets out in detail the opinions expressed by the Admiral. As is pointed out in that ▌ opinion, it could hardly be ▌ contended that he was not fixed in his beliefs about certain concepts of law. He had openly declared that every member who appeared before the court-martial was guilty of some offense. He acknowledged the rules governing presumption of innocence and burden of proof, but he must have had some misconception about both. I have tried to reason out how the mental processes of a mind possessed of his views could objectively determine the guilt or innocence of one charged with an offense. In doing so, I have been unable to escape the conclusion that he believed the presumption of innocence was not applicable in a general court-martial case. If he knew the accused was guilty of some offense

because he was on trial, the presumption of innocence could never be more than a presumption that an accused did not commit the most serious crime charged. Under that belief, one accused of a crime would be required to prove his innocence before he could expect a finding of not guilty.

The impact of the Admiral's views would increase in direct proportion to the influence he could exert on the other members of the court-martial. As will later appear, I do not mean to convey the impression that the Admiral attempted to exert any improper influence, but he did occupy positions which permitted him to mold opinions, be they good or bad. The Chief Judge's decision deals adequately with his assignment as president of the court, so I pass that and dwell more fully on his roles as orientor of the court-martial and initiator of efficiency ratings.

The record discloses that the Admiral had been detailed, or he assumed the prerogative, to orientate all court-martial members on the law and their duties as officers of the court-martial. If he implanted in their minds the pronounced views he held, then all members of the court-martial were misinformed in legal areas which would not be covered by the law officer. I have in previous cases expressed the view that we must find from the record that the members of the court-martial followed the law expounded by that functionary. I have no desire to depart from that principle, but this case offers a classic example of how misinformation given by one in apparent authority may lead a court-martial into error without the members failing to follow the instructions. The instructions sometimes given to court-martial members are meager and there are many fields undeveloped. This happens to be one of those cases. To make my point clear, I will deal only with an offense involved in this case. In instructing on desertion, this law officer merely stated to the court-martial members that they must find: that the accused absented himself without proper authority from his ship; that he intended at the time he absented himself, or at some time during his absence,

to remain away permanently; that the desertion was of a duration alleged; and that it was terminated on or about the date alleged. It is to be noted that the instruction on intent was not amplified and nothing was said concerning the oft-expressed view that if an absence without authority is much prolonged, and there is no satisfactory explanation, the court may infer from that fact alone an intent to remain absent permanently. As pointed out in the opinion of the Chief Judge, the Admiral had a strong and abiding conviction that sixty days was a fixed factor in the formula for determining intent. If that concept was taught to the members of the court-martial in the orientation lectures, and if it was discussed in the private deliberations of the members, it would not be contrary to, nor conflict in any way with, the instructions of the law officer. It would, nevertheless, be erroneous and prejudicial. That formula not only fixed an arbitrary period for a prolonged absence, but it failed to consider the question of the reasonableness of any explanation offered by an accused. We thus have a situation where a senior member of the court is permitted to instruct on the law prior to trial and his students must deliberate in secret with him during the trial. The probabilities preponderate heavily in favor of their following his teachings. I, of course, do not believe the Code contemplated that a person who is detailed as president of a court-martial should be selected as the one to orient the other members on the law and on the procedure. By this assignment alone an impression would be created that he is an authority on both, and other court members undoubtedly would look to him to fill in the legal interstices in the instructions. The principles he would expound in the role of an instructor might—as they did here—become controlling on the issues. If they were not in conflict with the instructions given by the law officer, they would carry error into the secret deliberations and the instructor would be there present to perpetuate the error. That procedure smacks too much of a one-man operation. The lecturer from the stand would become the president of the court-martial and the leader in the deliberations. Be that right or wrong, his views on the law would be given undue weight.

There is yet another factor in this case which weighs in favor of the conclusion that the court members followed the Admiral's unquestioned concept. He was not only the teacher and the proctor of the findings, he was the officer selected to render efficiency reports on the two permanent members of the court. In addition, he had requested permission to submit similar reports on other officers who performed as court members. This, of course, placed him in the preferred position of reporting on the manner in which court-martial members performed their duties. One of the traits requiring rating in an efficiency report is the judgment of the officer reported upon. Assuming, as we must, that the Admiral instructed the court members in the same vein as he testified in court, and assuming further, as I must, that the officers were left free to exercise their own independent judgment and to decide the case in accordance with the facts and their own conscience, independence on their part does not overcome the vice. They would have no reason to depart from the belief that sixty days of absence established desertion as a matter of law, nor from the view that persons tried before a court-martial were guilty of some offense. They were not instructed to the contrary on either of those precepts. I can understand how officers might feel free to evaluate factual disputes even in the presence of one who might report adversely on them. But I feel reasonably certain that in those areas they would not possess the same freedom of expressing their views as they would in a different personnel climate. But more to the point, the probabilities are that they would not contest an interpretation of the law as announced by the reporting officer. There would be no occasion for them to take issue, and always in the background would be the desire to accomplish a task to the satisfaction of a reporting officer. The task is being performed under his close scrutiny; he rates solely on the performance of du-

ties as a court-martial member; he is part of the deliberating team; and his satisfactory performance of duties is so closely tied in with the success or failure of the court that the correctness of its findings are of paramount importance to him. If his beliefs of guilt are fixed before trial, a finding of guilty of some offense is required; and if a contrary finding is returned, because the Government failed to prove a case beyond a reasonable doubt, in his view a miscarriage of justice results. One who voted for such a finding could hardly expect a commendation from him. Furthermore, if several findings of not guilty were returned during a reporting period, the efficiency report might reflect a lack of judgment. If the power to render efficiency reports, which usually vests in the convening authority, exerts any influence on court members there is much more here. Some of the insulating factors present in that situation are sadly lacking in this case. There the convening authority does not participate in the deliberations, his views on the law are not declared, his desires for a finding of guilt are unexpressed, and the proceedings are detached from his immediate influence. Under the arrangement used in the present instance, the reporting officer is so strategically positioned that he hears all, sees all, knows all, and can report on all. He is the captain who plots the course to be followed and the deviates are well known by him. A fair and just trial cannot flourish in that climate.

BROSMAN, Judge (concurring in the result) :

I prefer to dissociate myself at this time from the use made in the principal opinion of the Voorhees case, cited therein. There is a good deal to be said on the question of whether military personnel possess "any constitutional rights other than those which may have been duplicated by specific grants from Congress"—but I see no real point in saying it here. Nor do I believe that this Court met the matter squarely in Voorhees.

I am also troubled about some of the implications of the language used in the principal opinion in its treatment of a "prolonged absence." However, an expression of my difficulties would require an elaboration not justified by the present problem—and I shall content myself with the entry of a gentle *caveat*.

In addition to the foregoing, I concur in the views expressed by Judge Latimer.