UNITED STATES, Appellee

v

JAMES E. HUBBARD, Private,
U. S. Army, Appellant

20 USCMA 482, 43 CMR 322

No. 23,517

April 9, 1971

*Captain Robert B. Harrison, III*, argued the cause for Appellant, Accused. With him on the brief were *Colonel George J. McCartin, Jr.*, and *Captain Bernard J. Casey*.

*Captain M. M. O'Dowd, Jr.*, argued the cause for Appellee, United States. With him on the brief were *Colonel David T. Bryant, Lieutenant Colonel Ronald M. Holdaway*, and *Captain Benjamin G. Porter*.

## Opinion of the Court

DARDEN, Judge:

The trial counsel in this case was the deputy staff judge advocate. In that position he was the immediate superior officer of the trial defense counsel and the assistant defense counsel, and he endorsed their efficiency reports. Whether such a relationship inherently deprived the appellant of due process is the question that engages the Court's attention.

A general court-martial at Fort Jackson, South Carolina, tried the appellant for unpremeditated murder and an unauthorized absence. It convicted him of voluntary manslaughter and of an absence of a period less than that charged. His sentence—a dis-

honorable discharge, total forfeitures, confinement at hard labor for five years, and reduction to the lowest enlisted grade—remains intact.

This trial was completed in three days. The record shows that Hubbard was arraigned and that he entered his plea on August 6, 1969. The defense was then granted a continuance until August 19, 1969. The court reconvened on that date and continued through the following day.

Opposing appellate counsel agree that the trial counsel, a major, was the "indorser for efficiency report purposes" of trial defense and assistant defense counsel, both captains, for the rating period April 22 to August 16, 1969. Afterward, he continued to rate the defense counsel but not the assistant counsel, who had departed on a permanent change of station shortly after trial. The trial counsel had reported to Fort Jackson on May 26, 1969, and then had gone on leave. He returned to duty "on or about 16 June 1969 and assumed the position of Deputy Staff Judge Advocate at that time."

The appellate defense attack on this relationship expressly disavows any insinuation of impropriety in action or motive in the conduct of this case. The appellate defense counsel does declare, however, that the relationship of trial counsel in this case has such an intrinsic appearance of evil as to amount to a deprivation of due process. This argument continues that the organizational arrangement harbors a "subtle coercive phenomena," that prevents recognition of specific prejudice. A rehearing is required, according to the appellate defense counsel, since Hubbard could not have made a knowing and intelligent election to proceed with assigned counsel when he was unaware that his counsel was a subordinate of the trial counsel.

Two different boards of review have considered the same issue this case presents. In United States v Blackburn, 31 CMR 340, 343 (ABR 1961), the decision viewed an arrangement of this type with disfavor and recommended that it be avoided "where possible." That opinion found no prejudice, because the record clearly revealed an "adequate unhampered defense." In United States v Moore, 35 CMR 683 (CGBR 1964), the decision was that an able and enthusiastic defense countered the possibility that a defense counsel might be less than vigorous and effective as a result of the trial counsel's status.

In its opinions in the few cases having an issue comparable to the one in the instant case, this Court has demonstrated a wariness toward relationships that could affect the integrity of a trial. In one of those cases, United States v Dean, 5 USCMA 44, 17 CMR 44 (1954), a rear admiral assigned by the Bureau of Personnel as a permanent court member acted as a president of a general court-martial. He prepared the fitness report of permanent court members, his rating being based primarily upon their court performance. The danger of infringement on other court members' right to act freely, brought about by the unusual nature of this type of fitness report, was one of several reasons for reversing that accused's conviction.

In United States v Hayes, 7 USCMA 477, 479, 22 CMR 267 (1957), a conviction was sustained, although the trial counsel, as the staff judge advocate, was the defense counsel's superior and rating officer. Since civilian counsel conducted Hayes's defense, the Court found no improper influence. The opinion did state, however, that:

". . . [I]n certain circumstances the official relationship between the two [military counsel] might adversely affect the freedom of action of the subordinate and seriously circumscribe his professional judgment."

This observation follows the views expressed in *Blackburn* and *Moore,* both supra.

Neither the Uniform Code of Military Justice nor the Manual for Courts-Martial, United States, 1969

(Revised edition), prohibits the relationship that is the issue in this case. Congress has recently considered the safeguards it considers appropriate as a result of the defense counsel's being a member of a military organization, in which status his performance must be evaluated for the purpose of his advancement or elimination from service. The Military Justice Act of 1968 added this subsection to Article 37, Uniform Code of Military Justice, 10 USC § 837:

> "(b) In the preparation of an effectiveness, fitness, or efficiency report, or any other report or document used in whole or in part for the purpose of determining whether a member of the armed forces is qualified to be advanced, in grade, or in determining the assignment or transfer of a member of the armed forces or in determining whether a member of the armed forces should be retained on active duty, no person subject to this chapter may, in preparing any such report (1) consider or evaluate the performance of duty of any such member as a member of a court-martial, or (2) give a less favorable rating or evaluation of any member of the armed forces because of the zeal with which such member, as counsel, represented any accused before a court-martial."

A proposal to enhance the independence of defense counsel by transferring their supervision from a staff judge advocate of a convening authority to the Judge Advocate General of the service concerned is pending before the current Congress.[1] A similar provision in existing law insulates military judges of general courts-martial from administrative control by convening authorities.[2]

The staff judge advocate section of some military organizations may be so small that the staff judge advocate or the deputy staff judge advocate must participate in the trial of cases in which the opposing counsel is a person the judge advocate or deputy judge advocate must rate. An arrangement in which an accused could not be harmed would have the superior officer always serving as defense counsel. If this is not practical in some situations, such as where the staff judge advocate is trying a case, the judge advocate or deputy judge advocate could refrain from rating the persons against whom he had been trying cases. We are confident that some such improvisation could avoid the doubts or suspicion that can spring from the rating officer's functioning as trial counsel against a defense counsel he must report on.

Despite our awareness that a relationship of the kind this case presents should be closely scrutinized for possible prejudice to an accused, we decline to hold that such a relationship is prejudicial *per se*.

---

[1] S. 1127, 92d Congress, First Session (1971).

[2] "(c) The military judge of a general court-martial shall be designated by the Judge Advocate General, or his designee, of the armed force of which the military judge is a member for detail by the convening authority, and, unless the court-martial was convened by the President or the Secretary concerned, neither the convening authority nor any member of his staff shall prepare or review any report concerning the effectiveness, fitness, or efficiency of the military judge so detailed, which relates to his performance of duty as a military judge. A commissioned officer who is certified to be qualified for duty as a military judge of a general court-martial may perform such duties only when he is assigned and directly responsible to the Judge Advocate General, or his designee, of the armed force of which the military judge is a member and may perform duties of a judicial or nonjudicial nature other than those relating to his primary duty as a military judge of a general court-martial when such duties are assigned to him by or with the approval of that Judge Advocate General or his designee." [Article 26, Uniform Code of Military Justice, 10 USC § 826.]

No basis exists for questioning the adequacy of defense counsel's performance. Cf. United States v Kitchens, 12 USCMA 589, 31 CMR 175 (1961). That Hubbard's counsel performed creditably is conceded. Despite defense counsel's efforts the court convicted Hubbard, but for offenses less serious than those with which he was charged. In these circumstances, we are convinced the appellant's defense counsel was unrestrained in his actions and that the appellant's choice of counsel was uncompromised. Accordingly, we affirm the decision of the Court of Military Review.

Chief Judge QUINN concurs.

FERGUSON, Judge (dissenting):

I dissent.

The lifeblood of any officer's career is his efficiency report. They "are the medium for obtaining a continuous picture of each officer's performance and potential" and provide a measure "of an officer's overall value to the service and information essential to the career development, including assignments, of individual officers." AR 623–105, paragraphs 1–2, 4–1. To subject a defense counsel to having his career depend on the efficiency ratings given him by the prosecutor in the same case has such a potential for an adverse impact on our adversary system of justice that it should be flatly forbidden and its occurrence held generally prejudicial.

How can there be any due process or public confidence in military justice when we are confronted with supposed opponents and advocates, one of whom depends on the other for the success of his career, his promotions, his assignments, indeed, whether he will in fact even be able to remain an officer? The keystone of legal ethics is the avoidance of conflicts of interests. Our Canons repeatedly recognize the truth of the Scriptural injunction that no man can serve two masters. See Canons 5, 6, Canons of Professional Ethics of the American Bar Association. Is it not enough that defense counsel are subjected to the pressures inherent in having their performance rated by the staff judge advocate, who has already recommended trial in the case and thus occupies a somewhat hostile position? Must defense counsel also be subjected to the direct and palpable effect of having his rating officer oppose him in the courtroom—knowing that every refusal to cooperate with the Government, every weakness he exploits on the accused's behalf, and every point which he advocates may directly jeopardize his career—from his next assignment to his next promotion?

These are not fantasies. They are the very real and hard facts of military life. It is intolerable to submit defense counsel to such a test of his integrity—a situation which no civilian court or bar would for a moment tolerate—and I find nothing in our precedents or in the Code to justify such an amazing procedure. To the contrary, I believe our cases directly prohibit the practice here involved.[1]

In United States v Dean, 5 USCMA 44, 17 CMR 44 (1954), we were early met with a particularly outrageous attempt to control judicial deliberations by use of the efficiency or fitness report. There, the Navy created a permanent general court-martial, some of whose members performed no other duties. The president, a rear admiral, served as their rating officer, assessing their performance as court members. In the face of denials that such a situation would affect these members' careers, most having already reached the apex, we unhesitatingly reversed, pointing out, at page 53:

". . . We are sure that these members possessed normal independence and fortitude, but human

---

[1] The Army itself partially recognizes the evil inherent here for it forbids the rating of members of its judiciary by convening authorities or members of their staff. Change No. 1 to AR 623–105, paragraph 1–4i, September 16, 1970.

weakness frequently leads men to 'crook the pregnant hinges of the knee where thrift may follow fawning.' In our opinion, the omnipresence of these reports was so significant that the permanent members of the court could hardly effectively insulate themselves against it."

In United States v Hayes, 7 USCMA 477, 22 CMR 267 (1957), we sustained a conviction wherein the trial counsel was appointed defense counsel's superior, but only because accused was represented by civilian defense counsel, who had assumed the burden of the defense. Even so, we cautioned that the relationship was one which "might adversely affect the freedom of action of the subordinate and seriously circumscribe his professional judgment. See United States v Dein, 5 USCMA 44, 52–53, 17 CMR 44." *Hayes*, supra, at page 479.

In United States v Kitchens, 12 USCMA 589, 31 CMR 175 (1961), we were confronted with a case in which the staff judge advocate issued a letter bearing on inadequate sentences. While reversing for the pernicious effect of that document, we noted that, after raising the issue at trial, defense counsel received a substantially lower efficiency rating at the hands of the staff judge advocate. We declared, at page 592:

". . . The inference suggested to us is that the reduction in rating is a form of pernicious command influence which we should strike down. See United States v Dein, 5 USCMA 44, 17 CMR 44. The circumstances may indeed call for vigorous investigation, and if the allegation is established, may justify punitive proceedings." [Footnote 3.]

The teaching of these cases is plain. This Court has heretofore vigorously and forthrightly intervened to prevent the utilization of superior-subordinate efficiency rating procedures as a means of either controlling courts-martial procedures or creating the opportunity for such control. As we said in *Dein*, supra, at page 53, "an appearance of evil must be avoided

**486**

as much as the evil itself." Our strong protests both in our opinions and in our Annual Report led Congress to prohibit outright the evaluation of a court member's performance or the giving of a less favorable rating to any defense counsel because of his zeal in advocating the cause of his client. Article 37, Uniform Code of Military Justice, 10 USC § 837.

This is not enough. There are no known trials for violations of Code, supra, Article 37. What must be done is to follow the teaching of United States v Dein, supra, and eliminate the evil by exorcising its foundation. In short, we should hold that assignment of an efficiency reporting superior as trial counsel to conduct a prosecution wherein his subordinate acts as defense counsel is generally prejudicial and requires reversal just as occurred in *Dein*, supra. To hold otherwise is invidiously to weaken the system, to deny it confidence in the eyes of the public, and, at one fell stroke, to leave the integrity of counsel's performance dependent on the unenforced provisions of Article 37, Code, supra.

Turning to the rationale of the principal opinion, it is obvious that I find it unpersuasive. It minimizes the effect of the Chief Judge's reasoning in United States v Dein, supra, by subordinating the main thrust of the opinion to the other reversible errors found there. It points to pending legislation designed to cure the situation presented *in futuro*. It concedes suspicion and doubt of the practice and suggests it be avoided. Finally, it avoids condemnation and concludes that, in any event, there was no prejudice to the accused, as counsel performed creditably.

Most of these considerations appear irrelevant. What Congress may do in the future will not help Private Hubbard, nor will our gentle animadversions prevent recurrence of the practice. Finally, and most importantly, how can one measure the effect of the relationship here involved? Who can tell whether stipulations were made,

points overlooked, witnesses not called, or arguments not made, because counsel looked not to the accused but to his future? I hasten to add that I do not contend Hubbard's counsel was guilty of such derelictions. I simply argue that the practice of law and the art of advocacy are such that one cannot from the cold record intelligently conclude as to motivation for actions or omissions which might or might not be due to the impermissible pressures brought to bear by the efficiency reporting system. To reiterate the apt language of the Chief Judge in *Deain,* supra, "the omnipresence of these reports was so significant that the permanent members of the court could hardly effectively insulate themselves against it." So also would I hold in this case —United States v Deain revisited— that the omnipresence of the trial counsel's writing the defense counsel's efficiency reports is so significant that the only insulation against it is reversal.

I would reverse the decision of the Court of Military Review and order a rehearing.