CRAWFORD, Chief Judge
(dissenting):
After the seven-game 1960 world series victory by my hometown Pittsburgh Pirates over the heavily favored New York Yankees, that ended when Bill Mazeroski hit a dramatic ninth inning home run over Yogi Berra’s head and the left center field wall of Forbes Field, Yogi explained the loss by saying, “We made too many wrong mistakes.”[1] Unfortunately, our performance in the arena of implied bias is filled with inconsistency, if not “wrong mistakes,” and today’s decision only compounds the confusion.
It is unclear whether the doctrine of implied bias even exists as a matter of law. See Smith v. Phillips, 455 U.S. 209, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982); United States v. Dinatale, 44 MJ 325, 329 (1996)(Cox, C.J., concurring). The Supreme Court has neither embraced nor rejected the doctrine. See, e.g., Andrews v. Collins, 21 F.3d 612, 620 (5th Cir.1994); Tinsley v. Borg, 895 F.2d 520, 527 (9th Cir.1990); Person v. Miller, 854 F.2d 656, 664 (4th Cir.1988). If it does exist, a conflict exists among the federal Courts of *178 Appeals concerning the standard of review and application of the doctrine.
The majority tests the military judge’s denial of a causal challenge against Colonel (COL) Williams for abuse of discretion. 56 MJ at 176-77. We have previously held, on numerous occasions, that the proper standard of review is “clear abuse of discretion.” See, e.g., United States v. White, 36 MJ 284, 287 (CMA 1993), cert. denied, 510 U.S. 1090, 114 S.Ct. 918, 127 L.Ed.2d 212 (1994); United States v. Dinatale, supra at 328; but see United States v. Warden, 51 MJ 78, 82 (1999)(abuse of discretion); compare United States v. Cerrato-Reyes, 176 F.3d 1253, 1260 (10th Cir.1999)(a trial court’s finding as to actual bias is reviewed for clear error, but the court’s finding as to implied bias is reviewed de novo), with United States v. Ai, 49 MJ 1, 5 n. 4 (1998)(declining to decide a “precise” standard for appellate review of implied bias challenges).
All military accused, like their counterparts in civilian criminal courts, have a right to a trial before an impartial factfinder. See Weiss v. United States, 510 U.S. 163, 179, 114 S.Ct. 752, 127 L.Ed.2d 1 (1994); Ai, supra at 4; RCM 912(f)(1), Manual for Courts-Martial, United States (2000 ed.). Assuming that the doctrine of implied bias does exist, other Courts of Appeals have limited its application to those exceptional and extraordinary circumstances where a juror’s emotional attachment to an issue or participant in the court proceeding was such that it was very unlikely, by any objective measurement, that an average person could remain impartial in deciding the merits of the case. See United States v. Greer, 223 F.3d 41, 53 & n. 3 (2d Cir.2000) (Juror’s failure to inform the court that he had been approached by an old acquaintance who was also a friend of the defendant’s, about “lend[ing] a ‘sympathetic ear,’ ” as well as this juror’s inadequate response to a question concerning whether any of his relatives had been accused of a crime, did not justify a finding of implied bias. The juror “was, after all, neither related to a party nor a victim of the defendants’ crimes.”); United States v. Polichemi, 201 F.3d 858, 863-64 (7th Cir.2000)(Failure to excuse a fifteen-year employee of the same U.S. Attorney’s Office that was prosecuting the ease for implied bias was error.); Fitzgerald v. Greene, 150 F.3d 357, 365 (4th Cir.1998)(Juror answered “No” to a question whether he or any member of his immediate family had been the victim of a rape, robbery, or abduction in a murder/rape/robbery trial. During deliberations, this juror revealed that his granddaughter had been molested as a child. The Court found no implied bias, since neither the juror nor anyone in his family was personally connected to any party in the case.).
See also Phillips, 455 U.S. at 222, 102 S.Ct. 940 (O’Connor, J., concurring); United States v. Gonzalez, 214 F.3d 1109 (9th Cir.2000)(implied bias found when juror gave equivocal answers about whether her recent divorce and family breakup — occasioned by her ex-husband’s use of cocaine, the same drug involved in the trial — would affect her judgment adversely); Dyer v. Calderon, 151 F.3d 970 (9th Cir.1998)(in a murder case, implied bias found when a juror, who had a brother murdered, failed to reveal this fact during voir dire); Hunley v. Godinez, 975 F.2d 316 (7th Cir.1992)(implied bias found when hotel rooms of the jurors, who were deliberating the defendant’s fate in a murder and burglary trial, were broken into); Burton v. Johnson, 948 F.2d 1150 (10th Cir.1991)(implied bias found when both juror and accused had been in abusive family situations); United States v. Eubanks, 591 F.2d 513 (9th Cir.1979)(implied bias found where a juror in a heroin distribution case had sons who were heroin users and were serving prison sentences); United States v. Allsup, 566 F.2d 68 (9th Cir.1977)(implied bias found in a bank robbery trial by seating jurors who worked for a different bank which had been robbed); Jackson v. United States, 395 F.2d 615 (D.C.Cir.1968)(implied bias found in a juror who had been involved in a love triangle similar to the one at trial); United States ex rel. De Vita v. McCorkle, 248 F.2d 1 (3d Cir.1957)(implied bias found when a juror was a robbery victim and defendant was on trial for robbery).
*179 Unlike other courts,[2] the majority finds that implied bias is an issue “of public perception and the appearance of fairness in the military justice system,” 56 MJ at 175, not one of individual court member disqualification based on that member’s bias. The majority finds reversible error in the composition of the court-martial panel because COL Williams’s presence erodes public confidence in the “legality, fairness, and impartiality” of the military justice system. See ECM 912(f)(l)(N). Since I have a bit more confidence in the judgment of the American public than does the majority, I find no clear abuse of discretion in the military judge’s denial of the causal challenge.
The American public with which I am familiar is both perceptive and informed. When presented with all the facts, it is most capable of making a fair and reasoned judgement. It is not limited to a handful of individuals dedicated either to vilifying or lionizing the role of a convening authority in the selection of court-martial members. The informed public understands the differences between courts-martial with members and trials in the civilian sector with civilian jurors. American citizens are also capable of understanding the differences between the military justice system and the various civilian criminal law systems, and knowing that in the military justice system, a convening authority selects court-martial members “by reason of age, education, training, experience, length of service, and judicial temperament.” Art. 25(d)(2), UCMJ, 10 USC § 825(d)(2).[3] The public can also understand *180 why court-martial members have been referred to as blue ribbon panels due to the quality of their membership. See United States v. Youngblood, 47 MJ 338, 346 (1997)(Crawford, J., dissenting); United States v. Rome, 47 MJ 467, 471 (1998)(Craw-ford, J., dissenting).
The thoughtful, conscientious public with which I am familiar would first want to know the facts before jumping to a conclusion. The record of trial establishes the following facts:
(1) COL Williams, the 2d Brigade Commander, was a permanent member of Court-Martial Convening Order Number 4. Lieutenant Colonel (LTC) Rogers, one of COL Williams’s battalion commanders, as well as LTC Rogers’s executive officer (XO), Major (MAJ) Gonsalves, were also permanent members of Court-Martial Convening Order Number 4. Command Sergeant Major (CSM) Arroyo was also designated as a member by this Court-Martial Order whenever an accused requested enlisted membership on the court.
(2) LTC Mereness and LTC Hough were detailed to appellant’s court-martial only by Court-Martial Convening Order Number 6.
(3) LTC Hough was a Forward Support Battalion (FSB) commander assigned to the Division Support Command. He had a command supervisory relationship with COL
Williams only when LTC Hough’s battalion was in direct support of the 2d Brigade, such as during deployment situations.
(4) COL Williams only had rating responsibility for three members — his two battalion commanders, LTC Rogers and LTC Mereness, and LTC Rogers’s XO, MAJ Gonsalves. The record discloses that COL Williams was the reviewer of First Sergeant Waters’s enlisted efficiency report, but not a rater.
(5) Appellant challenged three individuals based on implied bias at trial — COL Williams, MAJ Gonsalves, and CSM Arroyo. There is no stated rationale why trial defense counsel challenged the most senior member of the panel (COL Williams), but then challenged two subordinates (MAJ Gonsalves and CSM Arroyo) instead of those members’ superior officers, LTC Rogers and LTC Hough, respectively.
(6) The military judge found that there were two combat brigades with the 3d Infantry Division stationed at Fort Stewart, one of which was deployed to Kuwait. The military judge also correctly found that the FSB (LTC Hough and CSM Arroyo) was not a part of the 2d Brigade.[4]
Of course, an astute and inquisitive general public would not be limited to the record of trial when gathering facts to test the fairness and impartiality of appellant’s court martial. Inquiring minds would also discover that one *181 of Fort Stewart’s brigades was deployed, shrinking the potential pool from which the General Court-Martial Convening Authority could select members.
Since the informed and reasonable American public understands the structure of the United States armed forces, to include the necessity for superior-subordinate relationships, the public would disagree with the majority when it finds that COL Williams had a superior-subordinate relationship with six of the other nine members. Actually, COL Williams was superior to all of the other members of the court-martial panel. Furthermore, the public would understand that the president of every court-martial is superior in rank to all other members of the panel. Since the public will accept the majority recognizing that the members were, in fact, impartial, and will know that appellant has not challenged the veracity of any individual member’s responses to voir dire questions, the inquiring public could be perplexed by the majority’s logic.
Finally, I believe that the American public, after reading the Supreme Court’s views in Weiss v. United States, 510 U.S. 163, 114 S.Ct. 752, 127 L.Ed.2d 1 (1994), and looking at the legislative history of Article 37, UCMJ, 10 USC § 837, would have no difficulty with the various working relationships among the court members who adjudicated appellant’s court-martial. However, the American public might be skeptical of this Court, which accords military judges “great deference” on questions of actual bias (because the trial judge has observed the demeanor of the participants),[5] but gives less deference on questions of implied bias, presumably because we can gauge the perception of the American public better than a trial judge.[6] Perhaps the informed American public, cognizant of the purpose of military justice, the history of the Uniform Code of Military Justice, and the creation of this Court, might ask why we have such limited confidence in a military judge’s ability to understand and make reasoned, informed decisions about the impartiality of court-martial members.
In sum, the average American would find that since the first combat brigade at Fort Stewart was deployed to Kuwait at the time of trial, appellant’s court-martial members were selected out of elements of the 3d Infantry Division remaining at Fort Stewart. After examining all of the underlying evidence associated with appellant’s court-martial and knowing all the facts, I believe a reasonable member of the public would find no unfairness, bias, or other illegality in the selection of those members who heard appellant’s court-martial, or in the denial of the challenge for cause against COL Williams.
The fundamental goal of a military court-martial member selection system, as in civilian society, is to identify and select a panel of court-martial members that is competent, fair, and impartial. A military system, however, must also produce panel members who are available without unduly restricting the conduct of the military mission or national security.
Department of Defense Joint Service Committee on Military Justice, Report on the Method of Selection of Members of the Armed Forces to Serve on Courts-MaHial 8 (1999). This goal was achieved in this case. Accordingly, I would affirm the decision of the Court of Criminal Appeals.

. Yogi Berra, The Yogi Book 34 (1998).

. The origin of "implied bias" in this Court can be traced to Judge Fletcher’s individual opinion in United States v. Harris, 13 MJ 288, 292 (CMA 1982). See United States v. Daulton, 45 MJ 212, 217 (1996). Implied bias was not a new concept. In United States v. Wood, 299 U.S. 123, 133, 57 S.Ct. 177, 81 L.Ed. 78 (1936), the Supreme Court held that “[t]he bias of a prospective juror may be actual or implied; that is, it may be bias in fact or bias conclusively presumed as a matter of law.” In support of his implied bias argument, Judge Fletcher relied on United States v. Deain, 5 USCMA 44, 17 CMR 44 (1954), and Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). These two cases reinforced the basic criminal law concept that an accused is entitled to be judged by one who is impartial, that is, one who has an open mind and is fair.
In the two decades that this Court has wrestled with the doctrine of implied bias, the focus of this Court has shifted from examining whether an average person, sitting in the position of the court member in controversy, would be fair and open-minded, to a concern about the impartiality of our military judicial system in the eyes of the public at large. Justice O’Connor’s admonition in Smith v. Phillips, 455 U.S. 209, 222, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982) (O’Connor, J., concurring), that implied bias be reserved for only the most exceptional circumstances seems to have been forgotten, or like some unfortunate aspects of our society, what used to be the exception has now become routine. See United States v. Smart, 21 MJ 15 (CMA 1985); United States v. Glenn, 25 MJ 278, 280 (CMA 1987); United States v. Napoleon, 46 MJ 279, 283 (1997); United States v. Warden, 51 MJ 78, 81 (1999); United States v. Armstrong, 54 MJ 51, 53-54 (2000).

. The convening authority, normally a senior commander in a chain-of-command, has always occupied a prominent role in militaiy justice. After World War II, in response to numerous complaints of perceived injustices, there were a number of investigating committees. Many of the organizations investigating the state of military justice, to include the American Bar Association’s Vanderbilt Committee, the American Legion, and the Veterans of Foreign Wars, advocated curtailing, if not removing, the convening authority from his central role in the court-martial process. The Secretary of War rejected changes that precluded a commander from appointing and reviewing courts-martial. See Gerald F. Crump, Part II: A History of the Structure of Military Justice in the United States, 1921-1966, 17 Air Force L.Rev. 55, 58-60 (1975); 1 Francis A. Gilligan & Fredric I. Lederer, Court-Martial Procedure §§ 1-44.00 & 1-45.00 at 14-16 (2d ed.1999).
Passage of the National Security Act of 1947 and the creation of the Department of Defense brought forth new legislation to make military justice uniform among all the services. Although the Elston Bill made many reforms in the military justice arena, "Congress acquiesced in the Army’s unwillingness to surrender the commander’s control of court-martial processing, but it made coercion of the court a criminal offense. The drafters felt that this provision, coupled with the broadening of review and establishment of an independent Judge Advocate General’s Corps, was a sufficient check on the commander’s abuse of his powers.” Crump, supra at 63 (footnotes omitted). Like most legislation, the Uniform Code of Military Justice represented a compromise, designed to ensure fairness in courts-martial proceedings. In particular, commanders still convened and reviewed courts-martial, but did so under exacting guidelines in such areas as legal advice, court-martial member selection, and a prohibition against unlawful command influence.
*180 Military justice has not been static, as it perhaps was in the middle of the Twentieth Century. Congress recently ordered a study on the selection of court-martial members. See Strom Thurmond National Defense Authorization Act for Fiscal Year 1999, Pub.L. No. 105-261, § 552, 112 Stat. 1920, 2023 (1998). After reexamining the role of the convening authority in the selection of court members and the exploration of alternatives, the Department of Defense Joint Service Committee on Military Justice concluded that the current system of selecting and detailing court-martial members "best applies the criteria in Article 25(d), UCMJ, in a fair and efficient manner,” and "[t]he role of the convening authority in the court member selection process should not be changed.” Report on the Method of Selection of Members of the Armed Forces to Serve on Courts-Martial 46-47 (1999)(hereinafter DoD Report).
Military justice can and should be a dynamic process, where introspection and reexamination take place. Cf. Report of the Commission on the 50th Anniversary of the Uniform Code of Military Justice (2001). It would appear, as my colleague Judge Effron recently opined, that "Congress ... has been sensitive to the need for fairness in military justice proceedings. In Article 25, Congress has provided members of the armed forces with a valuable protection by requiring the convening authority personally to select those members of the armed forces 'best qualified’ to serve as court members by reason of judicial temperament and related statutory criteria.” See United States v. Benedict, 55 MJ 451, 458 (2001)(Effron, J., dissenting).

. While I fully agree with the majority’s view that what is “reasonable and fair from the public's perception” might differ based on national security exigencies or military necessity, I totally disagree with the majority’s shifting the burden to the Government to demonstrate necessity for a particular member’s service on the panel. 56 MJ at 176. This burden shifting eviscerates Article 25, as well as the presumption of regularity asso *181 ciated with the selection of court members by the convening authority.

. See United States v. Giles, 48 MJ 60, 63 (1998); United States v. Lavender, 46 MJ 485, 488 (1997); United States v. Napoleon, 46 MJ 279, 283 (1997); United States v. White, 36 MJ 284, 287 (CMA 1993).

. We have forgotten our observation in United States v. Smart, 21 MJ 15, 19 (CMA 1985), that "[t]here are few aspects of a jury trial where we would be less inclined to disturb a trial judge’s exercise of discretion, absent clear abuse, than in ruling on challenges for cause in the empaneling of a juiy.” (citations omitted); see also United States v. Greer, 223 F.3d 41, 53 (2d Cir.2000).